RON BENDER (SBN 143364)
JULIET Y. OH (SBN 211414)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: RB@LNBYB.com, JYO@LNBYB.com, LLS@LNBYB.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:19-bk-21521-NB |
| TATUNG COMPANY OF AMERICA, INC., | Chapter 11 |
| Debtor and Debtor in Possession. | **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER, PENDING A FINAL HEARING, AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL** |
| | [Omnibus Declaration of Jason Chen and Declaration of Juliet Y. Oh Filed Concurrently Herewith] |
| | Date: [To be set] |
| | Time: [To be set] |
| | Place: Courtroom 1545 |
| | 255 E. Temple Street |
| | Los Angeles, California 90012 |

1

## SUMMARY

Pursuant to Local Bankruptcy Rules 2081-1 and 4001-2, 11 U.S.C. § 363, and Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Tatung Company of America, Inc., a California corporation and the chapter 11 debtor and debtor-in-possession herein (the "Debtor"), hereby moves, on an emergency basis (the "Motion"), for the entry of an interim order, pending a final hearing, authorizing the Debtor to use cash collateral in accordance with the Debtor's proposed operating budget for the approximately 13-week period through and including December 28, 2019 (the "Budget"), a copy of which Budget is attached as **Exhibit "1"** to the Omnibus Declaration of Jason Chen filed concurrently herewith (the "Chen Declaration"). The specific grounds for the Motion are set forth in detail in the attached Memorandum of Points and Authorities.

The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") on September 30, 2019 (the "Petition Date"). The Debtor continues to manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a privately held company headquartered in Long Beach, California that specializes in the manufacturing and distribution of consumer electronics, appliances and related products. Founded in 1972, the Debtor has been innovating technological solutions for home and commercial settings for over 40 years. The Debtor provides its products to both consumer and commercial markets and, over the years, the Debtor has expanded its market scope to provide world-class products and services to the industrial and educational sectors as well. The Debtor is predominantly a business-to-business (B2B) enterprise, and manufactures and distributes a variety of display products to the gaming, educational, and security industries. The Debtor has successfully brought to market security solutions for distributors and integrators, hotel lodging products for hotel suppliers, and kitchen appliances, such as rice cookers and air fryers, for e-commerce, storefronts, and grocery stores. In addition to products serving the consumer and commercial markets, the Debtor provides manufacturing services and tech-

solutions for some of the leading PC system manufacturers and original equipment manufacturers (OEM) around the world. The Debtor's offerings also include third-party logistics and procurement services to individuals and corporate customers globally.

Despite all of its success, the Debtor's business has declined over the past year due to the impact that the strain in China-United States trade relations has had on the Debtor's industry. In addition, the Debtor is currently facing a very large liability arising from defaults under a three-party settlement agreement (the "Settlement Agreement") entered into in September 2018 by the Debtor, Hemlock Semiconductor Operations LLC ("Hemlock"), and Green Energy Technology, Inc., Ltd., a publicly traded Taiwan company ("GET"). Although the disputes among the three parties arose from a long-term supply agreement between Hemlock and GET (the "Original Supply Agreement"), due to the Debtor's very limited role as the procurement service agent for GET in connection with the Original Supply Agreement, the Debtor was required to be added as a party to the Original Supply Agreement and subsequently the Settlement Agreement. Although the Settlement Agreement provided for GET and the Debtor to be jointly and severally liable for the settlement payments owing under the Settlement Agreement, given the Debtor's very limited role in the transactions contemplated by the Original Supply Agreement and the replacement supply agreement entered into by the parties thereafter (the "Replacement Supply Agreement") and the size and profitability of the Debtor's business, it was always the understanding of the Debtor and GET that GET would satisfy all of the financial obligations under the Original Supply Agreement, the Replacement Supply Agreement and the Settlement Agreement. Unfortunately, GET's financial condition worsened and GET ultimately entered into liquidation proceedings in Taiwan, at which point Hemlock began making demands on the Debtor to pay the obligations allegedly due under the Settlement Agreement and Replacement Supply Agreement. While the Debtor has attempted to settle with Hemlock, the Debtor's efforts to date have been unsuccessful.

Through its chapter 11 bankruptcy case, the Debtor seeks to obtain "breathing room" from its creditors while it takes steps to address the Debtor's operational and financial difficulties and to implement the changes required to return the Debtor to profitability. The Debtor believes that this, in turn, will enable the Debtor to formulate and pursue confirmation of a viable plan of reorganization or pursue an alternative transaction which allows the Debtor to restructure its existing debt in a cohesive and efficient manner and to continue operating its longstanding business.

In order to continue its business operations and preserve the going-concern value of its assets, the Debtor requires authority to use cash collateral. To the best of the Debtor's knowledge, the Debtor has only one secured creditor, East West Bank ("East West"), to whom the Debtor currently owes the sum of approximately $10,400,000 based upon a loan provided by East West to the Debtor prior to the Petition Date. The debt owed to East West is secured by substantially all of the Debtor's assets, including the Debtor's primary asset, the commercial real property located at 2850 East El Presidio Street, Long Beach, California 90810 (the "Property"). A copy of the preliminary title report reflecting the deed of trust recorded against the Debtor's Property by East West is attached as **Exhibit "A"** to the Declaration of Juliet Y. Oh (the "Oh Declaration") filed concurrently herewith. In addition, a copy of the UCC-1 financing statement recorded against the Debtor by East West is attached as **Exhibit "B"** to the Oh Declaration. As set forth in the Oh Declaration, the only other active UCC-1 financing statement recorded against the Debtor in California is one recorded by IBM Credit LLC for the financing of certain equipment. Based on the foregoing, the Debtor believes that East West is the only party that has a perfected security interest in the Debtor's cash.

Pursuant to this Motion, the Debtor seeks an order of the Court authorizing the Debtor to use its cash collateral, through and including December 28, 2019, to pay the operating expenses set forth in the Budget (which is attached as Exhibit "1" to the Chen Declaration filed concurrently herewith) as well as all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court. The Debtor also seeks

authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

As of the Petition Date, the Debtor's primary assets consist of: (i) the Property, which has an estimated fair market value of at least $13,000,000 based upon a recent broker's opinion of value, (ii) cash on hand in the amount of approximately $1,150,000, (iii) inventory with an estimated resale value of approximately $4,710,000, (iv) accounts receivable with a face value totaling approximately $3,800,000 (of which the Debtor believes approximately 75% is collectable, resulting in an estimated collectable value of $2,850,000 for such accounts receivable), and (v) business equipment and machinery, vehicles, and office equipment with an aggregate estimated value of approximately $347,000 (book value net of depreciation). Based on the aggregate value of the assets owned by the Debtor (*i.e.*, approximately $22,057,000) and based upon the amount of the debt owed to East West (*i.e.*, $10,400,000), the Debtor submits that East West is adequately protected by a substantial equity cushion in the assets owned by the Debtor.

As protection for the Debtor's use of cash collateral, the Debtor proposes that East West be granted a replacement lien on the Debtor's assets, to the extent of any diminution in value of East West's interest in the Debtor's pre-petition collateral, and to the same extent, validity, scope and priority of its respective pre-petition lien.

The Debtor also submits that East West is further adequately protected by the continued operation of the Debtor's business. As reflected in the Budget, the payment of the expenses set forth in the Budget and the Debtor's continued operation of its business will adequately protect East West, as the Debtor will continue to generate revenue and preserve the going-concern value of the Debtor's assets. If the Debtor is not permitted to use its cash collateral to operate its business and preserve the going-concern value of its assets, the Debtor will be forced to immediately shut down its business, which in turn will eliminate the Debtor's ability to generate any revenue. In short, the Debtor needs to spend its cash collateral to continue to generate cash

1 | revenue.

## ADDITIONAL INFORMATION

In compliance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2, the Debtor has filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing) which discloses whether the proposed order authorizing the Debtor to use cash collateral on an interim basis, pending a final hearing, contains certain provisions of findings of fact.

Pursuant to Bankruptcy Rule 4001, while the Court cannot conduct a final hearing on the Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtor to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing. For the reasons noted above, the Debtor respectfully submits that Debtor must be authorized to use its cash collateral to pay the expenses set forth in the Budget pending a final hearing in order to avoid immediate and irreparable harm to the Debtor's business and bankruptcy estate.

This Motion is based upon Local Bankruptcy Rules 2081-1 and 4001-2, 11 U.S.C. § 363, and Rule 4001 of the Federal Rules of Bankruptcy Procedure, this Motion, the supporting Memorandum of Points and Authorities, the Chen Declaration and the Oh Declaration filed concurrently herewith, the entire record in the Debtor's case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor has served the Motion upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the 20 largest unsecured creditors of the Debtor, and parties requesting special notice via overnight mail. Hard copies of this Motion are available upon request to the Debtor's proposed counsel whose contact information is located on the upper-left hand corner of this Motion. Upon obtaining a hearing date/time from the Court, the Debtor will serve notice of the hearing on this Motion via overnight mail.

**WHEREFORE,** the Debtor respectfully requests that this Court hold an emergency hearing on this Motion, and enter an interim order in substantially the form attached as **Exhibit "C"** to the Oh Declaration filed concurrently herewith:

(1)    affirming the adequacy of the notice given;

(2)    granting the relief requested in the Motion on an interim basis;

(3)    authorizing the Debtor to use cash collateral, on an interim basis pending a final hearing, to pay (i) all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)    finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

(5)    setting a final hearing to consider the entry of a final order granting the relief requested in the Motion; and

(6)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  September 30, 2019          TATUNG COMPANY OF AMERICA, INC.


By:_____
          RON BENDER
          JULIET Y. OH
          LINDSEY L. SMITH
          LEVENE, NEALE, BENDER, YOO
             & BRILL L.L.P.
          Proposed Attorneys for Chapter 11 Debtor
          and Debtor-in-Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### <u>STATEMENT OF FACTS</u>

**A.**     <u>**Description Of The Debtor And Its Business**</u>**.**

1.     On September 30, 2019, the Debtor commenced this bankruptcy case by filing a Voluntary Petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has operated its business and managed its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.     The Debtor is a privately held California corporation headquartered in Long Beach, California that specializes in the manufacturing and distribution of consumer electronics, appliances and related products.  Founded in 1972, the Debtor has been innovating technological solutions for home and commercial settings for over 40 years.  The Debtor provides its products to both consumer and commercial markets and, over the years, the Debtor has expanded its market scope to provide world-class products and services to the industrial and educational sectors.

3.     The Debtor is predominantly a business-to-business (B2B) enterprise, and manufactures and distributes a variety of display products to the gaming, educational, and security industries.  The Debtor has successfully brought to market security solutions for distributors and integrators, hotel lodging products for hotel suppliers, and kitchen appliances, such as rice cookers and air fryers, for e-commerce, storefronts, and grocery stores.

4.     In addition to products serving the consumer and commercial markets, the Debtor provides manufacturing services and tech-solutions for some of the leading PC system manufacturers and original equipment manufacturers (OEM) around the world.  The Debtor's offerings also include third-party logistics and procurement services to individuals and corporate customers globally.

5.     The Debtor is owned by three (3) shareholders, specifically (i) Tatung Company, a Taiwan-based publicly traded corporation ("<u>TT</u>"), which holds a 50% equity interest, (ii) Christina Sun, who holds a 25% equity interest and is an officer and director of the Debtor, and (iii) Andy

Sun, who holds a 25% equity interest and is a director of the Debtor. The Board of Directors for the Debtor (the "Board") is comprised of three (3) directors, including Christina Sun and Andy Sun. The other director of the Board has no role with the Debtor other than as a director of the Board.

**B.    Events Leading To The Filing Of The Debtor's Chapter 11 Case.**

6.    The Debtor generated net sales of $45,518,999 in 2017, and $38,580,256 in 2018. Despite all of its success, the Debtor's business has declined over the past year due to the impact that the strain in China-United States trade relations has had on the Debtor's industry.

7.    In addition to the negative impact that the strain in China-United States trade relations has recently had on the Debtor's business, the Debtor is currently facing a very large liability arising from defaults under a three-party settlement agreement (the "Settlement Agreement") entered into in September, 2018 by the Debtor, Hemlock Semiconductor Operations LLC ("Hemlock"), and Green Energy Technology, Inc., Ltd. ("GET"). GET is a publicly traded company in Taiwan which was at one time the largest solar cell technology producer in Taiwan. In 2011, GET entered into a Long-Term Supply Agreement with Hemlock (the "Original Supply Agreement"), pursuant to which GET agreed to purchase polysilicon from Hemlock to be used to manufacture its solar products. GET requested that the Debtor provide procurement services as an agent for GET in connection with the Original Supply Agreement, and Hemlock required the Debtor to be added as a party to the Original Supply Agreement.

8.    The Debtor itself does not manufacture solar products, nor does it use polysilicon in its business. In 2017 and 2018, the Debtor earned nominal revenue from the sale of solar products. The Debtor's economic interest in the Original Supply Agreement with Hemlock was but a small fraction compared to that of GET. As procurement agent, and under its arrangement with GET, the Debtor stood to earn only up to 0.35% of the total purchase amount of the polysilicon purchased by GET from Hemlock, for the shipping,

handling and logistics services that the Debtor was to provide; however, the Debtor never actually received any fees for such services.

9.    Within approximately four months, Hemlock alleged that GET had breached the terms of the Original Supply Agreement due to a market-wide crash in the price of polysilicon, and Hemlock eventually commenced litigation against GET and the Debtor. The parties negotiated a resolution of their disputes and entered into the Settlement Agreement, pursuant to which GET and the Debtor agreed to enter into a replacement supply agreement with Hemlock (the "Replacement Supply Agreement") and to make settlement payments to Hemlock totaling $35,000,000 over a period of ten years.  Since the Debtor, as procurement service agent, was a party to the Original Supply Agreement, Hemlock insisted that the Debtor be an obligor under the Replacement Supply Agreement and the Settlement Agreement.  At all times, the Debtor relied on GET to satisfy all of the financial obligations under the Original Supply Agreement, the Replacement Supply Agreement and the Settlement Agreement, and it was always the understanding of the Debtor and GET that GET would satisfy all of the financial obligations under the Original Supply Agreement, the Replacement Supply Agreement and the Settlement Agreement.

10.    Pursuant to the Settlement Agreement, the first settlement payment of $5,000,000 was required to be paid to Hemlock by January 31, 2019.  Although the Settlement Agreement provided for GET and the Debtor to be jointly and severally liable for the settlement payments owing under the Settlement Agreement, given the Debtor's very limited role in the transactions contemplated by the Original Supply Agreement and the Replacement Supply Agreement and the size and profitability of the Debtor's business, as indicated above, it was always the understanding of the Debtor and GET that GET would satisfy all of the financial obligations under the Original Supply Agreement, the Replacement Supply Agreement and the Settlement Agreement.

11.     Shortly after entering into the Settlement Agreement and Replacement Supply Agreement, GET's financial condition worsened and it was not able to make the first settlement payment to Hemlock as required by January 31, 2019.

12.     In June 2019, Hemlock demanded that GET and the Debtor make payments under the Settlement Agreement.  GET was unable to make any payment and, in July 2019, Hemlock sent default notices to both GET and the Debtor.  Thereafter, as an insolvent entity, GET entered into liquidation proceedings in Taiwan.

13.     Since that time, and with GET apparently unable to contribute towards any resolution given its pending liquidation proceedings, the Debtor has attempted to negotiate a reasonable and economically feasible and affordable settlement with Hemlock that would enable the Debtor to remain an economically viable entity preserving its going concern business and the jobs of its employees.  The parties have unfortunately not been able to reach any settlement that would make economic sense or be affordable for the Debtor as Hemlock did not respond to the Debtor's settlement offers, and Hemlock's settlement demand has been completely unreasonable and has been far in excess of the Debtor's total asset value.

14.     To help address the Debtor's financial difficulties and to assist the Debtor to navigate through a restructuring process, shortly before the Petition Date, the Debtor revamped its senior management team and retained a financial consulting firm, E&W Consulting LLC ("E&W"), to provide a talented Chief Restructuring Officer (Jason Chen) to serve as the Debtor's senior officer during the Debtor's chapter 11 bankruptcy proceeding.  E&W will also provide the Debtor with additional resources to assist Mr. Chen as necessary.  Subject to the approval of the Court, Mr. Chen and E&W will continue providing services to the Debtor post-petition and will report directly to the Debtor's Board of Directors.  The Debtor anticipates that Mr. Chen will be guiding the Debtor through its chapter 11 bankruptcy case, ensuring the Debtor's compliance with the numerous reporting requirements for a debtor-in-possession, and providing extensive guidance in connection with the Debtor's operational affairs and restructuring efforts.

15.     Through its chapter 11 bankruptcy case, the Debtor seeks to obtain "breathing room" from its creditors while it takes steps to address the Debtor's operational and financial difficulties and to implement the changes required to return the Debtor to profitability.  The Debtor believes that this, in turn, will enable the Debtor to formulate and pursue confirmation of a viable plan of reorganization or pursue an alternative transaction which allows the Debtor to restructure its existing debt in a cohesive and efficient manner and to continue operating its longstanding business.

**C.     Description Of The Debtor's Assets And Debts**

16.     As of the Petition Date, the Debtor's primary assets consist of: (i) the Debtor's primary asset, the commercial real property located at 2850 East El Presidio Street, Long Beach, California 90810 (the "Property"), which has an estimated fair market value of at least $13,000,000 based upon a recent broker's opinion of value, (ii) cash on hand in the amount of approximately $1,150,000, (iii) inventory with an estimated resale value of approximately $4,710,000, (iv) accounts receivable with a face value totaling approximately $3,800,000 (of which the Debtor believes approximately 75% is collectable, resulting in an estimated collectable value of $2,850,000), and (v) business equipment and machinery, vehicles, and office equipment with an aggregate estimated value of approximately $347,000 (book value net of depreciation).

17.     The Debtor believes its sole secured creditor is East West Bank ("East West"). Prior to the Petition Date, the Debtor obtained a loan from East West in the original principal sum of $15,000,000, which is secured by substantially all of the Debtor's assets, including the Property. True and correct copies of the Debtor's loan agreement and related documents with East West are attached as **Exhibit "2"** to the Declaration of Jason Chen filed concurrently herewith (the "Chen Declaration").  A copy of the preliminary title report reflecting the deed of trust recorded against the Debtor's Property by East West is attached as **Exhibit "A"** to the Declaration of Juliet Y. Oh (the "Oh Declaration") filed concurrently herewith.  In addition, a copy of the UCC-1 financing statement recorded against the Debtor by East West is attached as **Exhibit "B"** to the Oh

12

Declaration.  As of the Petition Date, the outstanding amount owed to East West is approximately $10,400,000.

18.    As set forth in the Oh Declaration, no other deeds of trust have been recorded against the Property, and the only other active UCC-1 financing statement recorded against the Debtor in California is one recorded by IBM Credit LLC for the financing of certain equipment. Based on the foregoing, the Debtor believes that East West is the only party that has a perfected security interest in the Debtor's cash.

19.    The Debtor is not aware of any other liens that have been asserted against the Debtor's Property, cash, inventory, accounts receivable, business and office machinery and equipment, automobiles/vehicles, and other assets.

20.    <u>Unsecured Debt.</u>  In addition to the secured debt described above, the Debtor has unsecured debts in the total estimated amount of $37,000,000 (including the disputed claim of Hemlock).

**D.    <u>The Need For Use Of Cash Collateral</u>**

21.    By this Motion, the Debtor seeks an order of the Court authorizing the Debtor to use its cash collateral, through and including December 28, 2019, to pay the operating expenses set forth in the proposed budget (the "<u>Budget</u>") attached as **<u>Exhibit "1"</u>** to the Chen Declaration filed concurrently herewith, as well as all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.  In addition, the Debtor seeks authority to deviate from the line items contained in the Budget, without the need for any further Court order, by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).  The Debtor will not deviate from the Budget beyond the foregoing parameters without further order of the Court.

22.    The Debtor must be able to use its revenue, in accordance with the Budget, to pay all of the Debtor's normal and ordinary operating expenses (such as payroll, rent, and utilities) as they come due in the ordinary course of its business and to purchase new inventory to replenish inventory that is used or sold to the Debtor's customers, which in turn will facilitate the continued

operation of the Debtor's business and the preservation and maximization of the going-concern value of the Debtor's business and assets.  If the Debtor does not obtain authority to use its cash collateral, the Debtor's estate will suffer immediate and irreparable harm, including, without limitation, a cessation of the Debtor's business operations and a corresponding (and likely substantial) decline in the value of the Debtor's business and assets.

## II.

## DISCUSSION

**A.    The Debtor Must Be Authorized To Use Cash Collateral To Operate Its Business And To Maintain And Preserve The Value Of Its Assets.**

The Debtor's use of property of its bankruptcy estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(l).

A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  *See* 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B)      the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

14

1  *See* 11 U. S.C. §363(c)(2)(A) and (B).

2  It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the

3  purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-*

4  *Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614

5  (9th Cir. BAP 1991).  In addition, where the debtor is operating a business, it is extremely

6  important that the access to cash collateral be allowed in order to facilitate the goal of

7  reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

8  collateral is necessary to operate a business."  *In re Dynaco Corporation*, 162 B.R. 389 (Bankr.

9  D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

10  The critical operating expenses that the Debtor must be able to pay to continue operating

11  its business during the first few months of this bankruptcy case are set forth in the Budget

12  attached as Exhibit "1" to the Chen Declaration.  The Debtor has no ability to continue to

13  maintain its business operations or to preserve and maximize the value of its assets unless the

14  Debtor is authorized to use its cash collateral to pay its projected expenses in accordance with the

15  Budget.  The Debtor's inability to pay such expenses would cause immediate and irreparable

16  harm to the Debtor's bankruptcy estate.  Indeed, the Debtor's inability to pay critical operating

17  expenses, including payroll, rent, and utilities, would result in the immediate shutdown of the

18  Debtor's retail store business and the decimation of the value (going-concern or otherwise) of the

19  Debtor's business and assets.  The maintenance of the Debtor's business and preservation and

20  maximization of the Debtor's assets are of the utmost significance and importance to a successful

21  reorganization of the Debtor through this Chapter 11 case.  In addition to the Debtor's normal

22  operating expenses, the Debtor seeks authority to use cash collateral to pay all quarterly fees

23  owing to the Office of the United States Trustee and all expenses owing to the Clerk of the

24  Bankruptcy Court.  To provide the Debtor with reasonable flexibility in the event that sales (and

25  correspondingly, operating expenses) are higher than projected or delayed, the Debtor also seeks

26  authority to deviate from the line items contained in the Budget by not more than 20%, on both a

27

28

1    line item and aggregate basis, with any unused portions to be carried over into the following

2    week(s).

3    **B.**    **East West, The Debtor's Sole Secured Creditor, Is Adequately Protected By A**

4         **Substantial Equity Cushion, The Debtor's Continued Operation And Maintenance**

5         **Of The Property, And Replacement Lien.**

6         Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a

7    secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is

8    adequately protected.   *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984).   *See also In re*

9    *O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R.

10   261, 265 (Bankr. C.D. Cal. l988) ("*McCombs*").

11        The Debtor believes that East West will consent to the Debtor's use of cash collateral to

12   pay the expenses set forth in the Budget in accordance with the terms and conditions set forth in

13   this Motion.   Accordingly, the Debtor submits that it should be authorized to use cash collateral

14   pursuant to section 363(c)(2)(A) of the Bankruptcy Code.

15        Even if East West does not consent to the Debtor's use of cash collateral, as proposed

16   herein, the Debtor submits that the value of East West's interest in the Debtor's cash collateral

17   will be adequately protected by a substantial equity cushion.   As discussed above, the Debtor

18   believes that East West is the only party who may have a perfected security interest in the

19   Debtor's cash.

20        Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood*

21   *Forest Associates*, 108 S.Ct. 626, 629 (1988) ("*Timbers*") and subsequent case law, the property

22   interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

23   Bankruptcy Code is only the value of the lien that secures the creditor's claim.   *Timbers*, 108

24   S.Ct. at 630.   *See also McCombs, supra*, at 266.   Section 506(a) "limit[s] the secured status of a

25   creditor (*i.e.*, the secured creditor's claim) to the lesser of the [allowed amount of the] claim or

26   the value of the collateral."   *McCombs* at 266.

27

28

16

The Ninth Circuit made clear in *Mellor, Id.* at 1401, that an equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in cash collateral. *See also In re McGowan,* 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Vir. 1980) (court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property).

Furthermore, in determining whether a secured creditor has equity in property, the Court should consider the "entire security package" not just a portion thereof. *In re Opelika Manufacturing Corporation*, 66 B.R. 444, 447-48 (Bankr. N.D. Ill. 1986).

As of the Petition Date, the Debtor's primary assets consist of: (i) the Property, which has an estimated fair market value of at least $13,000,000 based upon a recent broker's opinion of value, (ii) cash on hand in the amount of approximately $1,150,000, (iii) inventory with an estimated resale value of approximately $4,710,000, (iv) accounts receivable with a face value totaling approximately $3,800,000 (of which the Debtor believes approximately 75% is collectable, resulting in an estimated collectable value of $2,850,000 for such accounts receivable), and (v) business equipment and machinery, vehicles, and office equipment with an aggregate estimated value of approximately $347,000 (book value net of depreciation). Based on the foregoing, the aggregate value of the assets owned by the Debtor as of the Petition Date is estimated to be approximately $22,057,000. As noted above, the Debtor believes that the total amount currently owed to East West is $10,400,000. Given the aggregate value of the Debtor's assets (*i.e.*, approximately $22,057,000) and the amount currently owed to East West (*i.e.*, $10,400,000), East West is adequately protected by an equity cushion of more than 110%, well above the 20% range that the Ninth Circuit has indicated constitutes clear adequate protection of a secured creditor's interest in cash collateral.

Furthermore, the Debtor submits that the value of East West's interest in the Debtor's cash collateral will be adequately protected by, among other things, the maintenance and continued operation of the Debtor's business.

The law is clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988). *See also In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982). In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also In re McCombs, supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budget, the payment of the expenses necessary for the Debtor to maintain and continue operating its business will adequately protect East West because, by doing so, the Debtor will be able to, among other things, preserve and maintain the value of the Property, maximize the value of the Debtor's current inventory and accounts receivable, and generate as much revenue as possible from the sale of inventory and collection of accounts receivable. Other courts have determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest.

> Because the ultimate benefit to be achieved by a successful reorganization
> inures to all the creditors of the estate, a fair opportunity must be given to the
> Debtors to achieve that end.  Thus, while interests of the secured creditor whose
> property rights are of concern to the court, the interests of all other creditors
> also have bearing upon the question of whether use of cash collateral shall be
> permitted during the early stages of administration."

808 F.2d at 1937.

The use of cash collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors.  If the Debtor is not permitted to use cash collateral in accordance with the Budget to enable the Debtor to pay all of its normal operating expenses as they come due in the ordinary course of its business and to purchase new inventory to replenish merchandise that is sold to the Debtor's customers, which in turn will facilitate the continued operation of the Debtor's business and the preservation and maximization of the going-concern value of the Debtor's business and assets, the Debtor will be forced to immediately halt all business operations, which will significantly and negatively impact the value of the Debtor's business and assets.  Clearly, the use of cash collateral will only enhance the prospect of the Debtor's reorganization.

In addition to all of the forms of adequate protection discussed above, the Debtor also proposes to provide East West with a replacement lien and security interest against the Debtor's post-petition assets, to the extent of any diminution in value of East West's interest in the Debtor's pre-petition collateral, with such replacement lien to have the same extent, validity, and priority as the pre-petition lien held by East West.  Such replacement lien will provide East West with further adequate protection.

Given the foregoing forms of adequate protection being provided to East West for the Debtor's use of cash collateral, the Debtor submits that the requirements of Bankruptcy Code Section 363(c)(2) have been satisfied and that the Debtor should be authorized to use cash collateral in accordance with the terms set forth in this Motion.

**B.      Procedural Requirements Regarding Approval Of The Motion Have Been Satisfied.**

Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") set forth procedural requirements for obtaining use of cash collateral and post-petition

financing.   There are three general procedural requirements.   The Debtor submits that it has complied with these procedural requirements.   First, the Motion must contain a copy of the proposed form of order granting the Motion, which has been done by attaching the proposed order as **Exhibit "C"** to the Oh Declaration filed concurrently herewith.   Second, the Motion must provide a concise statement of the relief requested, which was done above.   Third, the Motion is required to be served on any entity with an interest in the Debtor's cash collateral, any committee appointed or the twenty largest unsecured creditors if there is no committee, and on such other parties as the Court directs.   Here, the Debtor has served a copy of the Motion and all supportive papers upon the Office of the United States Trustee, all known secured creditors and their counsel (if known), the twenty largest unsecured creditors of the Debtor, and parties requesting special notice.   Accordingly, the Motion complies with the requirements of Bankruptcy Rules 4001(b) and 4001(c).

In addition, in compliance with Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2, the Debtor has filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing), which discloses whether the proposed order granting the motion and authorizing the Debtor to use cash collateral contains certain provisions of findings of fact.   Accordingly, the Motion complies with the procedural requirements of Local Bankruptcy Rule 4001-2.

## III.

## CONCLUSION

Based upon all of the foregoing, the Debtor respectfully requests that this Court hold an emergency hearing on this Motion, and enter an interim order in substantially the form attached as **Exhibit "C"** to the Oh Declaration filed concurrently herewith:

(1)    affirming the adequacy of the notice given;

(2)    granting the relief requested in the Motion on an interim basis;

(3)    authorizing the Debtor to use cash collateral, on an interim basis pending a final hearing, to pay (i) all of the expenses set forth in the Budget, with authority to deviate from the

line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court;

(4)    finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

(5)    setting a final hearing to consider the entry of a final order granting the relief requested in the Motion; and

(6)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  September 30, 2019         TATUNG COMPANY OF AMERICA, INC.

By:_____
          RON BENDER
          JULIET Y. OH
          LINDSEY L. SMITH
          LEVENE, NEALE, BENDER, YOO
              & BRILL L.L.P.
          Proposed Attorneys for Chapter 11 Debtor
          and Debtor-in-Possession