RON BENDER (SBN 143364)
JULIET Y. OH (SBN 211414)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: RB@LNBYB.com, JYO@LNBYB.com, LLS@LNBYB.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.:19-bk-21521-NB |
| TATUNG COMPANY OF AMERICA, INC., | Chapter 11 |
|     Debtor and<br>    Debtor in Possession. | **OMNIBUS DECLARATION OF JASON CHEN IN SUPPORT OF DEBTOR'S "FIRST DAY" MOTIONS** |
| | Date:    [To be set]<br>Time:    [To be set]<br>Place:    Courtroom 1545<br>           255 E. Temple Street<br>           Los Angeles, California 90012 |

I, Jason Chen, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.      I am currently the acting Chief Restructuring Officer ("CRO") for Tatung Company of America, Inc., the debtor and debtor in possession herein (the "Debtor").  My consulting firm, E&W Consulting LLC ("E&W"), was retained by the Debtor shortly before the commencement of the Debtor's bankruptcy case on September 30, 2019 (the "Petition Date") to provide me as CRO to serve as the Debtor's senior officer during the Debtor's chapter 11 bankruptcy proceeding and to provide additional resources to assist me as necessary.  Subject to the approval of the Court, E&W and I will continue providing services to the Debtor post-petition and will report directly to the Board of the Debtor.

3.      In my capacity as CRO of the Debtor, I have access to the Debtor's books and records and have reviewed the organization, operations and financial condition of the Debtor.  The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own review and knowledge of the Debtor's books and records.

4.      I make this declaration in support of the following "first day" motions filed concurrently herewith by the Debtor:

> a.  "Debtor's Emergency Motion For Entry Of An Interim Order, Pending A Final Hearing, Authorizing The Debtor To Use Cash Collateral" (the "Cash Collateral Motion");
>
> b.  "Debtor's Emergency Motion For Entry Of An Order Authorizing The Debtor To Implement And Maintain Cash Management System" (the "Cash Management Motion");
>
> c.  "Debtor's Emergency Motion For Authority To (1) Pay Pre-Petition Priority Wages; And (2) Honor Employment And Benefit Policies" (the "Wage Motion"); and

d.  "Debtor's Emergency Motion For Entry Of An Order Authorizing Debtors To Provide Adequate Assurance Of Future Payment To Utility Companies Pursuant To 11 U.S.C. § 366" (the "Utility Motion").

**A.    Description Of The Debtor And Its Business.**

5.    On September 30, 2019 (the "Petition Date"), Tatung Company of America, Inc. (the "Debtor"), the debtor and debtor in possession herein, filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code").  The Debtor is operating its business, managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.    The Debtor is a privately held California corporation headquartered in Long Beach, California that specializes in the manufacturing and distribution of consumer electronics, appliances and related products.  Founded in 1972, the Debtor has been innovating technological solutions for home and commercial settings for over 40 years.  The Debtor provides its products to both consumer and commercial markets and, over the years, the Debtor has expanded its market scope to provide world-class products and services to the industrial and educational sectors.

7.    The Debtor is predominantly a business-to-business (B2B) enterprise, and manufactures and distributes a variety of display products to the gaming, educational, and security industries.  The Debtor has successfully brought to market security solutions for distributors and integrators, hotel lodging products for hotel suppliers, and kitchen appliances, such as rice cookers and air fryers, for e-commerce, storefronts, and grocery stores.

8.    In addition to products serving the consumer and commercial markets, the Debtor provides manufacturing services and tech-solutions for some of the leading PC system manufacturers and original equipment manufacturers (OEM) around the world.  The Debtor's offerings also include third-party logistics and procurement services to individuals and corporate customers globally.

9.    The Debtor is owned by three (3) shareholders, specifically (i) Tatung Company, a Taiwan-based publicly traded corporation ("TT"), which holds a 50% equity interest, (ii) Christina

Sun, who holds a 25% equity interest and is an officer and director of the Debtor, and (iii) Andy

Sun, who holds a 25% equity interest and is a director of the Debtor.  The Board of Directors for

the Debtor (the "Board") is comprised of three (3) directors, including Christina Sun and Andy

Sun.  The other director of the Board has no role with the Debtor other than as a director of the

Board.

**B.      Events Leading To The Filing Of The Debtor's Chapter 11 Case.**

10.     The Debtor generated net sales of $45,518,999 in 2017, and $38,580,256 in

2018.  Despite all of its success, the Debtor's business has declined over the past year due to

the impact that the strain in China-United States trade relations has had on the Debtor's

industry.

11.     In addition to the negative impact that the strain in China-United States trade

relations has recently had on the Debtor's business, the Debtor is currently facing a very

large liability arising from defaults under a three-party settlement agreement (the

"Settlement Agreement") entered into in September, 2018 by the Debtor, Hemlock

Semiconductor Operations LLC ("Hemlock"), and Green Energy Technology, Inc., Ltd.

("GET").  GET is a publicly traded company in Taiwan which was at one time the largest

solar cell technology producer in Taiwan.  In 2011, GET entered into a Long-Term Supply

Agreement with Hemlock (the "Original Supply Agreement"), pursuant to which GET

agreed to purchase polysilicon from Hemlock to be used to manufacture its solar products.

GET requested that the Debtor provide procurement services as an agent for GET in

connection with the Original Supply Agreement, and Hemlock required the Debtor to be

added as a party to the Original Supply Agreement.

12.     The Debtor itself does not manufacture solar products, nor does it use

polysilicon in its business.  In 2017 and 2018, the Debtor earned nominal revenue from the

sale of solar products.  The Debtor's economic interest in the Original Supply Agreement

with Hemlock was but a small fraction compared to that of GET.  As procurement agent,

and under its arrangement with GET, the Debtor stood to earn only up to 0.35% of the total

4

purchase amount of the polysilicon purchased by GET from Hemlock, for the shipping, handling and logistics services that the Debtor was to provide; however, the Debtor never actually received any fees for such services.

13.    Within approximately four months, Hemlock alleged that GET had breached the terms of the Original Supply Agreement due to a market-wide crash in the price of polysilicon, and Hemlock eventually commenced litigation against GET and the Debtor. The parties negotiated a resolution of their disputes and entered into the Settlement Agreement, pursuant to which GET and the Debtor agreed to enter into a replacement supply agreement with Hemlock (the "Replacement Supply Agreement") and to make settlement payments to Hemlock totaling $35,000,000 over a period of ten years. Since the Debtor, as procurement service agent, was a party to the Original Supply Agreement, Hemlock insisted that the Debtor be an obligor under the Replacement Supply Agreement and the Settlement Agreement. At all times, the Debtor relied on GET to satisfy all of the financial obligations under the Original Supply Agreement, the Replacement Supply Agreement and the Settlement Agreement, and it was always the understanding of the Debtor and GET that GET would satisfy all of the financial obligations under the Original Supply Agreement, the Replacement Supply Agreement and the Settlement Agreement.

14.    Pursuant to the Settlement Agreement, the first settlement payment of $5,000,000 was required to be paid to Hemlock by January 31, 2019. Although the Settlement Agreement provided for GET and the Debtor to be jointly and severally liable for the settlement payments owing under the Settlement Agreement, given the Debtor's very limited role in the transactions contemplated by the Original Supply Agreement and the Replacement Supply Agreement and the size and profitability of the Debtor's business, as indicated above, it was always the understanding of the Debtor and GET that GET would satisfy all of the financial obligations under the Original Supply Agreement, the Replacement Supply Agreement and the Settlement Agreement.

15.    Shortly after entering into the Settlement Agreement and Replacement Supply Agreement, GET's financial condition worsened and it was not able to make the first settlement payment to Hemlock as required by January 31, 2019.

16.    In June 2019, Hemlock demanded that GET and the Debtor make payments under the Settlement Agreement.  GET was unable to make any payment and, in July 2019, Hemlock sent default notices to both GET and the Debtor.  Thereafter, as an insolvent entity, GET entered into liquidation proceedings in Taiwan.

17.    Since that time, and with GET apparently unable to contribute towards any resolution given its pending liquidation proceedings, the Debtor has attempted to negotiate a reasonable and economically feasible and affordable settlement with Hemlock that would enable the Debtor to remain an economically viable entity preserving its going concern business and the jobs of its employees.  The parties have unfortunately not been able to reach any settlement that would make economic sense or be affordable for the Debtor as Hemlock did not respond to the Debtor's settlement offers, and Hemlock's settlement demand has been completely unreasonable and has been far in excess of the Debtor's total asset value.

18.    To help address the Debtor's financial difficulties and to assist the Debtor to navigate through a restructuring process, shortly before the Petition Date, the Debtor revamped its senior management team and retained a financial consulting firm, E&W Consulting LLC ("E&W"), to provide me as Chief Restructuring Officer to serve as the Debtor's senior officer during the Debtor's chapter 11 bankruptcy proceeding.  E&W will also provide the Debtor with additional resources to assist me as necessary.  Subject to the approval of the Court, E&W and I will continue providing services to the Debtor post-petition and will report directly to the Debtor's Board of Directors.  The Debtor has requested that I guide the Debtor through its chapter 11 bankruptcy case, ensuring the Debtor's compliance with the numerous reporting requirements for a debtor-in-possession, and providing extensive guidance in connection with the Debtor's operational affairs and restructuring efforts.

19.     Through its chapter 11 bankruptcy case, the Debtor seeks to obtain "breathing room" from its creditors while it takes steps to address the Debtor's operational and financial difficulties and to implement the changes required to return the Debtor to profitability.  The Debtor believes that this, in turn, will enable the Debtor to formulate and pursue confirmation of a viable plan of reorganization or pursue an alternative transaction which allows the Debtor to restructure its existing debt in a cohesive and efficient manner and to continue operating its longstanding business.

**C.     Description Of The Debtor's Assets And Debts.**

20.     As of the Petition Date, the Debtor's primary assets consist of: (i) the Debtor's primary asset, the commercial real property located at 2850 East El Presidio Street, Long Beach, California 90810 (the "Property"), which has an estimated fair market value of at least $13,000,000 based upon a recent broker's opinion of value, (ii) cash on hand in the amount of approximately $1,150,000, (iii) inventory with an estimated resale value of approximately $4,710,000, (iv) accounts receivable with a face value totaling approximately $3,800,000 (of which the Debtor believes approximately 75% is collectable, resulting in an estimated collectable value of $2,850,000), and (v) business equipment and machinery, vehicles, and office equipment with an aggregate estimated value of approximately $347,000 (book value net of depreciation).

21.     It is my understanding and belief that the Debtor's sole secured creditor is East West Bank ("East West").  Prior to the Petition Date, the Debtor obtained a loan from East West in the original principal sum of $15,000,000, which is secured by substantially all of the Debtor's assets, including the Property.  True and correct copies of the Debtor's loan agreement and related documents with East West are attached as **Exhibit "2"** hereto.  East West has recorded a deed of trust and assignment of rents against the Debtor's Property and has recorded a UCC-1 financing statement against the Debtor in California.  As of the Petition Date, the outstanding amount owed by the Debtor to East West is approximately $10,400,000.

22.     To the best of my knowledge, no other deeds of trust have been recorded against the Property, and the only other active UCC-1 financing statement recorded against the Debtor in

California is one recorded by IBM Credit LLC for the financing of certain equipment.  Based on the foregoing, I believe that East West is the only party that has a perfected security interest in the Debtor's cash.

23.    I am not aware of any other liens that have been asserted against the Debtor's Property, cash, inventory, accounts receivable, business and office machinery and equipment, automobiles/vehicles, and other assets.

24.    Unsecured Debt.  In addition to the secured debt described above, the Debtor has unsecured debts in the total estimated amount of $37,000,000 (including the disputed claim of Hemlock).

**D.    Cash Collateral Motion.**

25.    By the Cash Collateral Motion, the Debtor seeks an order of the Court authorizing the Debtor to use its cash collateral, through and including December 28, 2019, to pay the operating expenses set forth in the proposed budget (the "Budget") attached as **Exhibit "1"** hereto, as well as all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.  In addition, the Debtor seeks authority to deviate from the line items contained in the Budget, without the need for any further Court order, by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).  The Debtor will not deviate from the Budget beyond the foregoing parameters without further order of the Court.

26.    The Debtor must be able to use its revenue, in accordance with the Budget, to pay all of the Debtor's normal and ordinary operating expenses (such as payroll, rent, and utilities) as they come due in the ordinary course of its business and to purchase new inventory to replenish inventory that is used or sold to the Debtor's customers, which in turn will facilitate the continued operation of the Debtor's business and the preservation and maximization of the going-concern value of the Debtor's business and assets.  If the Debtor does not obtain authority to use its cash collateral, I believe that the Debtor's estate will suffer immediate and irreparable harm, including, without limitation, a cessation of the Debtor's business operations and a corresponding (and likely

substantial) decline in the value of the Debtor's business and assets.

27.    The Budget sets forth the critical operating expenses that I believe the Debtor must be able to pay to continue operating its business during the first few months of this bankruptcy case.  The Debtor has no ability to continue to maintain its business operations or to preserve and maximize the value of its assets unless the Debtor is authorized to use its cash collateral to pay its projected expenses in accordance with the Budget.  Indeed, the Debtor's inability to pay critical operating expenses, including payroll, rent, and utilities, would result in the immediate shutdown of the Debtor's business and the decimation of the value (going-concern or otherwise) of the Debtor's business and assets.

28.    Moreover, the use of cash collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors.  If the Debtor is not permitted to use cash collateral in accordance with the Budget to enable the Debtor to pay all of its normal operating expenses as they come due in the ordinary course of its business and to purchase new inventory to replenish merchandise that is sold to the Debtor's customers, which in turn will facilitate the continued operation of the Debtor's business and the preservation and maximization of the going-concern value of the Debtor's business and assets, the Debtor will be forced to immediately halt all business operations, which will significantly and negatively impact the value of the Debtor's business and assets.

29.    To provide the Debtor with reasonable flexibility in the event that sales (and correspondingly, operating expenses) are higher than projected or delayed, the Debtor also seeks authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).

30.    The Debtor also proposes to provide East West with a replacement lien and security interest against the Debtor's post-petition assets, to the extent of any diminution in value of East West's interest in the Debtor's pre-petition collateral, with such replacement lien to have the same extent, validity, and priority as the pre-petition lien held by East West.

**E.    Cash Management Motion.**

31.    Prior to the Petition Date, the Debtor maintained, among others, one bank account at East West and one bank account at Bank of the West.  Pursuant to the Cash Management Motion, the Debtor seeks to maintain and keep open these two pre-petition checking accounts. Specifically, the Debtor seeks to maintain and keep open the Debtor's checking account at East West Bank ending in 3869 (the "East West Bank Account") and maintain and keep open the Debtor's checking account at Bank of West ending in 4362 (the "Bank of the West Bank Account," and together with the East West Bank Account, the "Maintained Bank Accounts") following the Petition Date.  The Debtor will close the Debtor's other pre-petition bank accounts in accordance with the Guidelines of the Office of the United States Trustee.

32.    The Maintained Bank Accounts receive deposits from a large amount of the Debtor's customers, including the Debtor's largest customer.  Currently, the Debtor uses the Maintained Bank Accounts to receive payments from customers and to make general operating disbursements.  However, pursuant to the Cash Management Motion, the Debtor is seeking only to maintain and keep open the Maintained Bank Accounts for the purpose of receiving payments from its customers, and not to make disbursements from such accounts.  All of the funds deposited into the Maintained Bank Accounts will be transferred, in their entirety, to the Debtor's debtor-in-possession bank accounts, from which the Debtor will make any necessary disbursements.  The East West Bank Account is an account that is controlled by East West, the Debtor's secured lender, which, prior to the Petition Date, was swept by East West on a regular basis.  Since East West is prohibited from sweeping the funds deposited into the East West Bank Account post-petition, as a result of the automatic stay, all of the funds that are deposited by customers into the East West Bank Account will be transferred entirely to the Debtor's new debtor-in-possession bank accounts and accounted for accordingly.

33.    The Maintained Bank Accounts have been utilized by the Debtor for the collection of customer payments for some time and provide a very efficient and secure means of collecting and managing payments from many of the Debtor's customers.  If the Debtor is required to close

the Maintained Bank Accounts, almost all of the Debtor's customers will be forced to redirect their payments to new bank accounts, causing significant disruptions and delays in the Debtor's ability to collect payments (in substantial amounts) from its customers.

34.    Additionally, if the Debtor's customers are required to redirect their payments to new bank accounts, I believe that it is possible that the customers will decide to take their business elsewhere rather than incur the inconvenience of redirecting their deposits and dealing with a debtor in bankruptcy.

35.    I believe that the Debtor's transition into Chapter 11 will be significantly less disruptive if the Debtor is permitted to keep open the Maintained Bank Accounts for the sole purpose of accepting customer payments.  The Debtor will still open new debtor-in-possession accounts and sweep all of the funds from the Maintained Bank Accounts into the new debtor-in-possession bank accounts prior to making any disbursements.

**F.    Wage Motion.**

36.    The Debtor currently employs approximately 52 non-insider employees (collectively, the "Employees," and each, an "Employee").  The majority of the Employees are paid on an hourly basis.  The Debtor has two different payrolls – a payroll paid each week (the "Weekly Payroll") and a payroll that is paid every two weeks (the "Bi-Weekly Payroll").

37.    The Employees on the Weekly Payroll are generally paid every week, approximately one week in arrears.  So, for example, on Friday, October 4, 2019, the Employees on the Weekly Payroll will need to be paid for a payroll period covering September 22, 2019 through September 28, 2019 (the "First Weekly Pay Period").  Thus, all of the Wages for the First Weekly Pay Period will have accrued before the Petition Date.  A list of the Debtor's Employees on the Weekly Payroll, which reflects the amount of Wages to be paid to the Employees on October 4, 2019, is attached as **Exhibit "3"** hereto.

38.    Additionally on Friday, October 11, 2019, the Employees on the Weekly Payroll will need to be paid for a payroll period covering September 29, 2019 through October 5, 2019 (the "Second Weekly Pay Period").  Thus, some of the Wages (for the one day of September 29, 2019) for the Second Weekly Pay Period will have accrued before the Petition Date.  A list of the

Debtor's Employees on the Weekly Payroll, which reflects the amount of Wages to be paid to the Employees on October 11, 2019, is attached as **Exhibit "4"** hereto.

39.    The Employees on the Bi-Weekly Payroll are generally paid every two weeks, approximately one week in arrears.  So, for example, on Friday, October 4, 2019, the Employees on the Bi-Weekly Payroll will need to be paid for a payroll period covering September 15, 2019 through September 28, 2019 (the "First Bi-Weekly Pay Period").  Thus, all of the Wages for the First Bi-Weekly Pay Period will have accrued before the Petition Date.  A list of the Debtor's Employees on the Bi-Weekly Payroll, which reflects the amount of Wages to be paid to the Employees on October 4, 2019, is attached as **Exhibit "5"** hereto.

40.    Additionally, on Friday, October 18, 2019, the Employees on the Bi-Weekly Payroll will need to be paid for a payroll period covering September 29, 2019 through October 12, 2019 (the "Second Bi-Weekly Pay Period").  Thus, some of the Wages (for the one day of September 29, 2019) for the Second Bi-Weekly Pay Period will have accrued before the Petition Date.  A list of the Debtor's Employees on the Bi-Weekly Payroll, which reflects the amount of Wages to be paid to the Employees on October 18, 2019, is attached as **Exhibit "6"** hereto.

41.    The Debtor also pays to the commissions owed to its Employees once a month (the "Commissions").  Commissions for the period covering September 1, 2019 to September 30, 2019 are due to be paid to the Employees on October 18, 2019.  The details of the Commissions to be paid on October 18, 2019, including the names of the Employees and the Commission amounts are set forth in the list attached as attached as **Exhibit "7"** hereto.

42.    The Debtor utilizes a payroll service, ADP ("ADP"), to process the payment of Wages to its Employees.  In the normal course of its relationship with ADP, the funds necessary for the payment of Wages are transferred to ADP or otherwise made available two (2) days prior to each payroll date (*i.e.*, every Wednesday).  ADP then ensures payment of Wages, either by check or direct deposit into the Employees' bank accounts, by the payroll date.

43.    The Debtor estimates that the total payroll obligations due on Friday, October 4, 2019 for the Weekly Payroll, including all payroll taxes, 401k employer contributions and insurance contributions, will be approximately $13,045.22. The foregoing amount will need to be

transferred to ADP or otherwise made available by the end of the day on <u>Wednesday, October 2, 2019</u>.

44.     The Debtor estimates that the total payroll obligations due on Friday, October 4, 2019 for the Bi-Weekly Payroll, including all payroll taxes, 401k employer contributions and insurance contributions, will be approximately $97,709.44.  The foregoing amount will need to be transferred to ADP or otherwise made available by the end of the day on <u>Wednesday, October 2, 2019</u>.

45.     The Debtor estimates that the total payroll obligations due on Friday, October 11, 2019 for the Weekly Payroll, including all payroll taxes, 401k employer contributions and insurance contributions, will be approximately $13,045.22.  The foregoing amount will need to be transferred to ADP or otherwise made available by the end of the day on <u>Wednesday, October 9, 2019</u>.

46.     The Debtor estimates that the total payroll obligations due on Friday, October 18, 2019 for the Bi-Weekly Payroll, including all payroll taxes, 401k employer contributions and insurance contributions, will be approximately $97,709.44.  The foregoing amount will need to be transferred to ADP or otherwise made available by the end of the day on <u>Wednesday, October 16, 2019</u>.

47.     The Debtor estimates that the total Commissions due on Friday, October 18, 2019, including all payroll taxes and 401k employer contributions, will be approximately $6,160.00.  The foregoing amount will need to be transferred to ADP or otherwise made available by the end of the day on <u>Wednesday, October 16, 2019</u>.

48.     The Debtor is **not** seeking authority to pay the pre-petition priority Wages of any employees who are, or may be considered, "insiders" within the definition of Section 101(31) of the Bankruptcy Code.  The lists of the Debtor's Employees, which are attached as **Exhibits "3" through "7"** to the Chen Declaration, do not include any "insider" employees of the Debtor.  Approval to pay compensation to the Debtor's "insider" employees will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

49.    The Debtor also provides its employees with certain employment and benefit programs comparable to the programs that are typically offered by other employers within the industry.  The specific programs offered by the Debtor are summarized below.

a.    ***Vacation Time And Paid Time Off Policy***.  The Debtor has adopted a paid vacation and sick leave policy for all full-time Employees.  Specifically, regular, full-time employees who have completed their introductory period (90 days from the date of hire) and who work forty hours per week are eligible to receive paid vacation and will accrue vacation time as follows:

| Date of hire up to six months of employment | No accrual |
|---|---|
| 6 months to 12 months | 40 hours per year |
| 1st year through 4th year | 80 hours per year |
| 5th year through 14th year | 120 hours per year |
| 15th year and thereafter | 160 hours per year |

Employees that are employed pursuant to the terms of a Collective Bargaining Agreement who have passed the probationary period (90 days from the date of hire) are entitled to accrued vacation, based upon the length of employment which accrues as follows:

| Date of hire up to six months of employment | No accrual |
|---|---|
| 6 months to 12 months | 40 hours per year |
| 1st year through 2nd year | 80 hours per year |
| 5th year through 9th year | 120 hours per year |
| 10th year through 19th year | 160 hours per year |
| 20th year and thereafter | 200 hours per year |

Regular employees who have completed their introductory periods are eligible for paid sick leave.  Sick days are earned on a prorated basis for time worked: one-half (1/2) a day for every month of service to a maximum of six (6) days per year.  Employees do not carry over any unused, accrued sick days after his/her anniversary date.  The Debtor desires to continue having its existing vacation and sick leave policy in effect and therefore, seeks authority to continue to honor such policy post-petition.  However, the Debtor will not permit employees to "cash out" any unused accrued vacation and/or sick days.

b.      ***Health, Dental and Life Insurance Policies.*** The Debtor provides a comprehensive medical, dental and life insurance plan for eligible employees and their dependents. Only full-time, regular employees who have completed their introductory period are eligible for insurance.  The Debtor currently pays 100% of the HMO plan premium for the employee; eligible dependents or family members may be added at the employee's expense.  The Debtor desires to continue having this health insurance policy in effect and therefore, seeks authority to continue to honor such policy post-petition.

c.      ***401(K) Plan Contribution Policy.***  The Debtor offers regular, full-time employees after twelve (12) continuous months of employment the opportunity to participate in the Debtor's 401(k) plan. The Debtor will match the employee's contributions at the rate of 40%, but only up to a maximum of 6% of the Employee's gross wages.  The matching contributions are submitted by the Debtor to the 401(k) administrator at the same time as payroll is paid.

16.     In summary, by the Wage Motion, the Debtor seeks authority to:

a.      pay pre-petition priority Wages to the Employees, including those which are due to be paid on Friday, October 4, 2019, Friday, October 11, 2019 and Friday, October 18, 2019 as described above;

b.      honor pre-petition priority Wages of the Employees, including those, if any, outstanding checks for Wages that were issued to such Employees prior to the Petition Date but were not yet deposited as of the Petition Date or that were returned for

insufficient funds due to the conversion of the Debtor's pre-petition bank accounts to debtor in possession accounts, and to issue replacement checks to the extent necessary to pay such Wages; and

c.    continue to honor the Debtor's employment and benefit policies as described above.

50.    The source of the funds to be used to pay Wages to Employees will be the Debtor's available cash and/or revenue. I believe that East West will contend that the Debtor's revenue constitutes its cash collateral.  Pursuant to the Cash Collateral Motion, the Debtor is requesting authority to use cash collateral in accordance with the Budget to allow the Debtor to continue operating its business, while preserving, maintaining, and enhancing the Debtor's going concern value.  As reflected in the Budget, I do not believe that the payment of Wages to Employees will render the Debtor's bankruptcy estate administratively insolvent.

**G.    <u>Utility Motion</u>.**

51.    The Debtor operates out of the Property, which the Debtor owns.  In connection with the operation of its business, the Debtor receives water, gas, electricity, telephone, internet and/or similar utility services from a number of utility companies (each a "<u>Utility Company</u>," and collectively, the "<u>Utility Companies</u>").  Given the importance of the services provided by the Utility Companies to the operation of the Debtor's business, I believe it is crucial that the means of providing adequate assurance to the Utility Companies that provide utility services to the Properties be determined promptly so that there is no interruption in the services provided.

52.    Attached as **<u>Exhibit "8"</u>** hereto is a list which sets forth, on an account-by-account basis, the name and address of each Utility Company that is currently providing utility services to the Debtor's Property, the account number with each Utility Company, and the amount of the cash deposit proposed to be paid to each Utility Company as adequate assurance of payment.

53.    The total aggregate amount of the cash deposits proposed to be paid to the Utility Companies by the Debtor, collectively, is $9,584.28.  Generally, for each account with a Utility

Company, the Debtor is proposing to provide the Utility Company with a cash deposit in an amount equal to the average monthly payment based on payments historically made on such account.  The methodology used to determine the proposed deposits was to average the monthly payments based on the total amount incurred in the last three to four months.

54.    In addition to the foregoing cash deposits, the Utility Companies will be kept current on all post-petition debts owed to such Utility Companies.

55.    The source of the funds to be used to pay the proposed cash deposits to the Utility Companies will be the Debtor's available cash and/or revenue. I believe that East West will contend that the Debtor's revenue constitutes its cash collateral.  Pursuant to the Cash Collateral Motion, the Debtor is requesting authority to use cash collateral in accordance with the Budget to allow the Debtor to continue operating its business, while preserving, maintaining, and enhancing the Debtor's going concern value.  As reflected in the Budget, I do not believe that the payment of the proposed utility deposits will render the Debtor's bankruptcy estate administratively insolvent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of September, 2019, at Sacramento, California.

Jason Chen, Declarant

# **EXHIBIT "1"**

[Budget]

**Tatung Company of America. Inc. - 13-Week Cash Flow Budget**

| Week Ending | Wk 1 10/5/19 | Wk 2 10/12/19 | Wk 3 10/19/19 | Wk 4 10/26/19 | Wk 5 11/2/19 | Wk 6 11/9/19 | Wk 7 11/16/19 | Wk 8 11/23/19 | Wk 9 11/30/19 | Wk 10 12/7/19 | Wk11 12/14/19 | Wk 12 12/21/19 | Wk 13 12/28/19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Beginning Balance | 1,150,000 | 867,295 | 631,103 | 245,303 | 165,145 | 50,193 | 109,332 | 73,124 | 161,232 | 565,638 | 583,145 | 692,241 | 767,731 |
| A/R Collection | 461,432 | 563,349 | 878,816 | 456,032 | 799,657 | 515,203 | 442,877 | 534,210 | 1,180,182 | 561,710 | 621,681 | 622,932 | 765,346 |
| **TOTAL CASH** | 1,611,432 | 1,430,644 | 1,509,919 | 701,335 | 964,802 | 565,396 | 552,209 | 607,334 | 1,341,414 | 1,127,348 | 1,204,826 | 1,315,173 | 1,533,077 |
| | | | | | | | | | | | | | |
| **Cost of Goods Sold (COGS)** | 565,305 | 759,345 | 1,100,431 | 464,353 | 717,188 | 418,748 | 330,343 | 410,165 | 575,262 | 437,934 | 360,586 | 515,923 | 420,000 |
| | | | | | | | | | | | | | |
| **Employee Wages, Tax and Benefits** | | | | | | | | | | | | | |
| Wages -TUS Employees | 111,800 | 12,000 | 117,500 | 12,000 | 111,800 | 12,000 | 111,800 | 12,000 | 121,200 | 12,000 | 111,800 | 12,000 | 118,200 |
| Contract Labor (2 overseas) | - | - | - | - | 5,350 | - | - | - | 5,350 | - | - | - | - |
| Payroll Tax (ER) | 6,932 | 744 | 7,285 | 744 | 6,932 | 744 | 6,932 | 744 | 7,514 | 744 | 6,932 | 744 | 7,328 |
| 401K (ER) | 2,000 | 225 | 2,150 | 225 | 2,000 | 225 | 2,000 | 225 | 2,200 | 225 | 2,000 | 225 | 2,150 |
| Health Ins (ER) | 32,000 | - | - | - | 32,000 | - | - | - | 32,000 | - | - | - | - |
| Workers Com Ins | - | - | - | 17,000 | - | - | - | - | 17,000 | - | - | - | - |
| **Subtotal:** | 152,732 | 12,969 | 126,935 | 29,969 | 158,082 | 12,969 | 120,732 | 12,969 | 153,264 | 44,969 | 120,732 | 12,969 | 127,678 |
| | | | | | | | | | | | | | |
| **Other OP Expenses** | | | | | | | | | | | | | |
| Freight-Out | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Freight-In | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Commission (Sales Rep) | - | - | - | - | 5,000 | - | - | - | 5,300 | - | - | - | - |
| Contract Labor - Security | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 |
| Temp - Production and Hub | 5,500 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| Supplies | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Rep & Maint - Bldg. | 3,500 | 500 | 500 | 500 | 3,500 | 500 | 500 | 500 | 500 | 3,500 | 500 | 500 | 500 |
| Rep & Maint - M/C & Equip. | - | - | - | - | 4,400 | - | - | - | 9,500 | - | - | - | - |
| Rep & Maint - Auto | - | - | 500 | - | - | - | - | - | - | 200 | - | - | - |
| Equipment/Office Rental | - | 1,947 | - | 1,418 | 340 | 1,947 | - | 1,418 | - | - | 1,947 | - | 1,418 |
| Postage | 150 | - | - | - | 150 | - | - | - | - | 150 | - | - | - |
| Utilities | - | 3,880 | - | - | - | - | 3,160 | - | - | - | 2,720 | - | - |
| Tax Expenses | - | - | - | - | - | - | - | - | - | 36,000 | - | - | - |
| License Fee | 400 | - | - | - | 400 | - | - | - | - | 400 | - | - | - |
| Telephone/Fax | 3,000 | 1,000 | 1,000 | 1,000 | 3,000 | 1,000 | 1,000 | 1,000 | 1,000 | 3,000 | 1,000 | 1,000 | 1,000 |
| Trade Show Expense | - | - | - | 2,000 | 2,000 | 2,000 | - | - | - | - | - | - | - |
| Travel | - | - | 3,000 | 3,000 | 3,000 | - | 1,000 | - | - | - | 3,000 | - | - |
| Meals Allowance | - | - | 500 | 1,000 | - | - | - | - | - | - | - | - | - |
| Auto | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Entertainment | - | - | - | 1,500 | - | - | 3,000 | - | - | - | 3,000 | - | - |
| Advertisement | - | - | 2,500 | - | - | - | - | - | - | - | - | - | - |
| Miscellaneous | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Credit Insurance | - | 350 | - | - | - | 350 | - | - | - | - | 350 | - | - |
| Insurance - General | - | - | - | 13,900 | - | - | - | - | 13,900 | - | - | - | 13,900 |
| Banking Charges | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| ADP Processing/Consulting | - | 2,000 | 1,700 | - | - | 1,000 | 1,800 | - | - | 1,000 | 1,700 | - | - |
| Testing & Inspection | - | - | - | - | - | - | - | 3,000 | - | - | - | - | - |
| **Subtotal:** | 26,100 | 27,227 | 27,250 | 41,868 | 39,340 | 24,347 | 28,010 | 22,968 | 47,250 | 61,300 | 31,267 | 18,550 | 33,868 |
| | | | | | | | | | | | | | |
| **TOTAL EXPENSES** | 744,137 | 799,541 | 1,254,616 | 536,190 | 914,610 | 456,064 | 479,085 | 446,102 | 775,776 | 544,203 | 512,585 | 547,442 | 581,546 |
| | | | | | | | | | | | | | |
| **POST-BK UTILITY DEPOSITS** | | | | 10,000 | | | | | | | | | |
| **UST QUARTERLY FEES (1%)** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Cash Ending Balance** | 867,295 | 631,103 | 245,303 | 165,145 | 50,193 | 109,332 | 73,124 | 161,232 | 565,638 | 583,145 | 692,241 | 767,731 | 951,531 |

# EXHIBIT "2"

[East West Loan Documents]

# DISCLOSURE OF RIGHT TO RECEIVE A COPY OF AN APPRAISAL

| | | | |
|---|---|---|---|
| **Applicant:** | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA  90810 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |

## Disclosure of Right to Receive a Copy of an Appraisal

**Application Number: 3803238**                              **Loan Number:  3803238**

You have the right to a copy of the appraisal report used in connection with your application for credit.  If you wish to have a copy, please write to us at the following mailing address East West Bank Appraisal Department 9300 Flair Drive, 6th Floor El Monte, CA  91731.  We must hear from you no later than ninety (90) days after we notify you about the action taken on your credit application or no later than ninety (90) days after you withdraw your application.

In your letter, give us the following information:

Borrower's name, property address and loan number

Upon your request, the appraisal report will be sent to:

    2850 East El Presidio Street
    Carson, CA  90810

**Costs of Providing the Appraisal Copy:**  You are required to pay the cost of the appraisal.

---

### APPLICANT ACKNOWLEDGMENT

I acknowledge that I have received a copy of this **Disclosure of Right to Receive a Copy of an Appraisal**.

APPLICANT:

TATUNG COMPANY OF AMERICA, INC.

By: _____          _____
    Huei-Jihn Jih, President of Tatung Company          Date
    of America, Inc.

LaserPro, Ver. 17.1.10.015  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFI\LFI\G14.FC  TR-26627  PR-7

# HAZARD INSURANCE DISCLOSURE

| Borrower: | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA  90810 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

## HAZARD INSURANCE DISCLOSURE

### Made Pursuant to California Civil Code Section 2955.5

### IMPORTANT

### DO NOT SIGN THIS FORM UNTIL YOU CAREFULLY
### READ IT AND UNDERSTAND ITS CONTENT

You have applied for a loan or credit accommodation that will be secured by real property. As a condition of the loan or credit accommodation, Lender may require you to maintain hazard insurance coverage for the real property. California law provides that Lender cannot require you, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the property (such as fire and other perils) in an amount exceeding the replacement value of the building or structures attached to the property.

**BY SIGNING BELOW, YOU ACKNOWLEDGE THAT YOU HAVE READ, RECEIVED AND UNDERSTAND THIS HAZARD INSURANCE DISCLOSURE. THIS DISCLOSURE IS DATED JUNE 7, 2017.**

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn  Jih,  President  of  Tatung  Company  of
America, Inc.

LaserPro, Ver. 17.1.10.015  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CF\LPL\I018.FC  TR-26627  PR-7

# CORPORATE RESOLUTION TO BORROW / GRANT COLLATERAL

| **Corporation:** | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA  90810 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

**I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:**

**THE CORPORATION'S EXISTENCE.**  The complete and correct name of the Corporation is Tatung Company of America, Inc. ("Corporation"). The Corporation is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California.  The Corporation is duly authorized to transact business in all other states in which the Corporation is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Corporation is doing business.  Specifically, the Corporation is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition.  The Corporation has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage.  The Corporation maintains an office at 2850 East El Presidio Street, Carson, CA  90810.  Unless the Corporation has designated otherwise in writing, the principal office is the office at which the Corporation keeps its books and records.  The Corporation will notify Lender prior to any change in the location of the Corporation's state of organization or any change in the Corporation's name.  The Corporation shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Corporation and the Corporation's business activities.

**RESOLUTIONS ADOPTED.**  At a meeting of the Directors of the Corporation, or if the Corporation is a close corporation having no Board of Directors then at a meeting of the Corporation's shareholders, duly called and held on **June 7, 2017**, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**OFFICER.**  The following named person is an officer of Tatung Company of America, Inc.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| Huei-Jihn Jih | President | Y  X | _____ |

**ACTIONS AUTHORIZED.**  The authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Corporation.  Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of the Corporation:

**Borrow Money.**  To borrow, as a cosigner or otherwise, from time to time from Lender, on such terms as may be agreed upon between the Corporation and Lender, such sum or sums of money as in his or her judgment should be borrowed, without limitation.

**Execute Notes.**  To execute and deliver to Lender the promissory note or notes, or other evidence of the Corporation's credit accommodations, on Lender's forms, at such rates of interest and on such terms as may be agreed upon, evidencing the sums of money so borrowed or any of the Corporation's indebtedness to Lender, and also to execute and deliver to Lender one or more renewals, extensions, modifications, refinancings, consolidations, or substitutions for one or more of the notes, any portion of the notes, or any other evidence of credit accommodations.

**Grant Security.**  To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Corporation or in which the Corporation now or hereafter may have an interest, including without limitation all of the Corporation's real property and all of the Corporation's personal property (tangible or intangible), as security for the payment of any loans or credit accommodations so obtained, any promissory notes so executed (including any amendments to or modifications, renewals, and extensions of such promissory notes), or any other or further indebtedness of the Corporation to Lender at any time owing, however the same may be evidenced.  Such property may be mortgaged, pledged, transferred, endorsed, hypothecated or encumbered at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated or encumbered.

**Execute Security Documents.**  To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances.

**Other Actions.**  (A) Enter into any interest rate, credit, commodity or equity swap, cap, floor, collar, forward, foreign exchange transaction, currency swap, cross currency swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, the foregoing or similar transactions with the Lender. (B) Apply for letters of credit or seek issuance of banker's acceptances under which the Corporation shall be liable to the Lender for repayment. (C) Purchase and sell foreign currencies, on behalf of the Corporation, whether for immediate or future delivery, in such amounts and upon such terms and conditions as the officer(s) authorized herein may deem appropriate, and give any instructions for transfers or deposits of monies by check, drafts, cable, letter or otherwise for any purpose incidental to the foregoing, and authorize or direct charges to the depository account or accounts of the Corporation for the cost of any foreign currencies so purchased through the Lender.

**Negotiate Items.**  To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Corporation or in which the Corporation may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the Corporation's account with Lender, or to cause such other disposition of the proceeds derived therefrom as he or she may deem advisable.

**Further Acts.**  In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, **including agreements waiving the right to a trial by jury**, as the officer may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.  The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from the Corporation, at Lender's address shown above, written notice of revocation of such authority:  **Huei-Jihn Jih, President of Tatung Company of America, Inc.**

**ASSUMED BUSINESS NAMES.**  The Corporation has filed or recorded all documents or filings required by law relating to all assumed business names used by the Corporation.  Excluding the name of the Corporation, the following is a complete list of all assumed business names under which the Corporation does business:  **None.**

**NOTICES TO LENDER.**  The Corporation will promptly notify Lender in writing at Lender's address shown above (or such other addresses as

# CORPORATE RESOLUTION TO BORROW / GRANT COLLATERAL

| Loan No: 3803238 | (Continued) | Page 2 |
|---|---|---|

Lender may designate from time to time) prior to any  (A)  change in the Corporation's name;  (B)  change in the Corporation's assumed business name(s);  (C)  change in the management of the Corporation;  (D)  change in the authorized signer(s);  (E)  change in the Corporation's principal office address;  (F)  change in the Corporation's state of organization;  (G)  conversion of the Corporation to a new or different type of business entity; or  (H)  change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and Lender.  No change in the Corporation's name or state of organization will take effect until after Lender has received notice.

**CERTIFICATION CONCERNING OFFICERS AND RESOLUTIONS.**  The officer named above is duly elected, appointed, or employed by or for the Corporation, as the case may be, and occupies the position set opposite his or her respective name.  This Resolution now stands of record on the books of the Corporation, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**NO CORPORATE SEAL.**  The Corporation has no corporate seal, and therefore, no seal is affixed to this Resolution.

**CONTINUING VALIDITY.**  Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved.  This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time).  Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Resolution, and I personally and on behalf of the Corporation certify that all statements and representations made in this Resolution are true and correct.  This Corporate Resolution to Borrow / Grant Collateral is dated **June 7, 2017.**

CERTIFIED TO AND ATTESTED BY:

X _____

Christina Sun, Secretary

NOTE:  If the officer signing this Resolution is designated by the foregoing document as one of the officers authorized to act on the Corporation's behalf, it is advisable to have this Resolution signed by at least one non-authorized officer of the Corporation.

# BUSINESS LOAN AGREEMENT

| | | | |
|---|---|---|---|
| **Borrower:** | **Tatung Company of America, Inc.**<br>**2850 East El Presidio Street**<br>**Carson, CA  90810** | **Lender:** | **East West Bank**<br>**Loan Servicing Department**<br>**9300 Flair Drive, 6th Floor**<br>**El Monte, CA  91731** |

**THIS BUSINESS LOAN AGREEMENT** dated June 7, 2017, is made and executed between Tatung Company of America, Inc. ("Borrower") and East West Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of June 7, 2017, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Huei-Jihn Jih, President of Tatung Company of America, Inc.**

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

> **Loan Documents.** Borrower shall provide to Lender the following documents for the Loan:  (1) the Note;  (2) Security Agreements granting to Lender security interests in the Collateral;  (3) financing statements and all other documents perfecting Lender's Security Interests;  (4) evidence of insurance as required below;  (5) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

> **Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

> **Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

> **Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

> **No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

> **Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 2850 East El Presidio Street, Carson, CA  90810. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

> **Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

> **Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under  (1) any provision of  (a) Borrower's articles of incorporation or organization, or bylaws, or  (b) any agreement or other instrument binding upon Borrower or  (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

> **Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

> **Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

> **Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

> **Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that:  (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral.  (2) Borrower has no

# BUSINESS LOAN AGREEMENT
(Continued)

knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Remittance Account.** Borrower agrees that it will to institute procedures and sign documents requested by Lender, whereby the payments and other proceeds of the Accounts shall be paid by the Account Debtors under a remittance account or lock box arrangement with Lender, or Lender's agent, or with one or more financial institutions designated by Lender. Borrower further agrees that, if no Event of Default exists under this Agreement, any and all of such funds received under such a remittance account or lock box arrangement shall be (1) 60% paid or turned over to Lender to be applied to the Indebtedness in such order and priority as Lender may determine within its sole discretion to Lender, and; (2) 40% deposited into one or more accounts for the benefit of Borrower (which deposit accounts shall be subject to a security assignment in favor of Lender. Borrower further agrees that, should one or more Events of Default exist, any and all funds received under such a remittance account or lock box arrangement shall be paid or turned over to Lender to be applied to the Indebtedness, again in such order and priority as Lender may determine within its sole discretion.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** Borrower understands and agrees that while this Agreement is in effect, Borrower will maintain a financial condition indicated by the following statements at all times, unless otherwise noted:

**Borrower Corporate Financial Statements.** As soon as available, but in no event later than one hundred fifty (**150**) days after the end of each **fiscal year**, Borrower shall provide Lender with balance sheet, income and expense statements, reconciliation of net worth and statement of cash flows, with notes thereto for the year ended, **audited** by a certified public accountant satisfactory to Lender.

**Borrower Corporate Interim Financial Statements.** As soon as available, but in no event later than forty-five (**45**) days after the end of each **quarter**, Borrower shall provide Lender with balance sheet, income and expense statements, reconciliation of net worth and statement of cash flows, with notes thereto for the period ended, **prepared by Borrower**.

**Agings.** Within twenty (**20**) days, or sooner, after the end of each **quarter**, Borrower shall provide Lender with a listing and aging by invoice date of all accounts receivable and all accounts payable in detailed format acceptable to Lender.

**Inventory.** Within twenty (**20**) days, or sooner, after the end of each **quarter**, Borrower shall provide Lender with a listing of inventory in detailed format acceptable to Lender.

**Debtor Information.** On an annual basis (December 31st), Borrower shall provide Lender with a listing of all Account Debtors including but not limited to their addresses and telephone numbers.

**Accounts Receivable Verification.** On an annual basis, Borrower shall provide Lender with an accounts receivable verification in detailed format acceptable to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 3803238                                                                                                Page 3

---

**Additional Requirements.** Borrower understands and agrees that while this Agreement is in effect, Borrower will maintain a financial condition indicated by the following ratios at all times, unless otherwise noted:

**Tangible Net Worth.** Maintain an effective Tangible Net Worth (defined as total book net worth plus minority interest, less due from officers/stockholders/affiliates minus intangible assets and accumulated amortization plus debt subordinated to East West Bank) of not less than **$6,750,000.00.**

**Debt to Tangible Net Worth.** Maintain a Debt to effective Tangible Net Worth (defined as total  liabilities minus debt subordinated to East West Bank divided by effective Tangible Net Worth defined as total book net worth plus minority interest, less due from officers/stockholders/affiliates minus intangible assets and accumulated amortization plus debt subordinated to East West Bank) not to exceed **3.00 to 1**.

**Current Ratio.** Maintain a Current Ratio (defined as total current assets divided by total current liabilities) of not less than **1.15 to 1.**

**Fixed Charge Coverage Ratio.** Maintain a Fixed Charge Coverage Ratio (defined as earnings before interest, taxes, depreciation, and amortization ("EBITDA") minus dividends/distributions divided by current portion of long term debt plus interest expense plus capital lease expenses) of not less than **1.25 to 1.**

**Profitability.** Borrower shall maintain annual profitability of no less than **$1.00.**

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as  (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the

# BUSINESS LOAN AGREEMENT
**(Continued)**

Loan No: 3803238             Page 4

---

environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan.

# BUSINESS LOAN AGREEMENT
**(Continued)**

Loan No: 3803238    Page 5

This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**Other Defaults Modified.** Notwithstanding the section above entitled "Other Defaults", Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or Agreement or in any of the Related Documents between Lender and Borrower; or any shareholder, member, trustor, or any owner of the Borrower also holding a controlling interest in any given entity's common stock, membership interest, trust interest, or any other ownership interest ("Related Entity"), fails to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and the Related Entity.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**ELECTRONIC INSTRUCTIONS.** Borrower desires to apply for Advances and instruct Lender regarding all other aspects of the Loan electronically, including but not limited to by electronic mail, internet, telex, telefax, facsimile and/or telecopy. Borrower agrees that Lender may act in accordance with electronically transmitted applications and instructions ("Electronic Instructions") subject to the following provisions: 1) Borrower's Electronic Instructions must be sent to Lender electronically only by means of such services and in such format(s) as may be approved from time to time by Lender in its sole discretion; 2) Borrower will provide to Lender, in writing and duly signed by Borrower, any reasonable security or verification procedures, and Lender may require additional security or verification procedures in its sole discretion; 3) Borrower hereby authorizes and instructs Lender to take all actions requested in any and all Electronic Instructions and agrees that each such Electronic Instruction will be deemed an original and, if sent in lieu of manually signed instructions, will be deemed to incorporate all of the terms and provisions of the Lender's standard form or format, if any, for such instructions; 4) Borrower recognizes and agrees that it will be obligated for any loan advance request and/or instruction pursuant to Electronic Instructions to the same extent as if such advance request and/or instruction were provided pursuant to Lender's standard form or Lender approved format(s) manually signed by Borrower; 5) Borrower agrees to indemnify and hold harmless Lender, its officers, directors, employees and affiliates against any and all liability, loss, cost, damages, attorneys' fees and other expenses which Lender may incur in reliance upon and pursuant to any and all of the Electronic Instructions received by Lender and purported to be sent by Borrower; 6) Lender is not responsible for checking electronic communications devices on a regular basis, and Borrower will make arrangements to assure Electronic Instructions have been sent to a current employee of Lender, and the employee of Lender has received and read the Electronic Instructions; 7) Lender is not responsible for delays, errors or omissions resulting from malfunction of electronic communications devices or from other conditions beyond the control of Lender; and 8) Lender is not responsible for misuse of or wrongful access to electronic communications devices by Borrower's representatives and employees nor for any delay in acting on Electronic Instructions caused by Electronic Instructions which Lender deems to be uncertain or unclear or incomplete.

**LINE USAGE.** The usage of the Loan shall be governed by the following sub-limits with:

**Maximum aggregate amount that may be outstanding under all sub-limits (items 1 through 6): $15,000,000.00.**
**The Maximum aggregate amount that may be outstanding under sub-limits (items 3 through 6): $15,000,000.00.**

1. Up to **$5,000,000.00** for issuance of **Sight Letters of Credit.** A "Sight Letter of Credit" means a Letter of Credit (a formal letter that authorizes a third party "beneficiary" to draw drafts on the Lender, under conditions stated in the letter which often require presentation of required documents in order, under applicable law, hereinafter referred to as "Letter of Credit") issued by Lender for Borrower that are payable upon draft by the beneficiary, provided the terms of the Letter of Credit are met.

2. Up to **$5,000,000.00** for issuance of **Usance Letters of Credit.** A "Usance Letter of Credit" means a Letter of Credit that is payable on a specific date after draft by the beneficiary, provided the terms of the Letter of Credit are met.

3. Up to **$2,000,000.00** for **Banker's Acceptances.** A "Banker's Acceptance" is a promised future payment, or time draft, which is accepted by Lender, often in connection with a Usance Letter of Credit.

4. Up to **$5,000,000.00** for advances of up to **90** days for **Trust Receipt Financing.** "Trust Receipt Financing" means an Advance to pay for release of goods to Borrower based upon title in favor of Lender to the released goods.

5. Up to **$5,000,000.00** for advances of up to **90** days for **Trust Receipt Financing** of Banker's Acceptances due and payable under Letters of Credit issued and accepted by Lender with the term of the Advance reduced by the tenor of the usance draft. The words "Trust Receipt Financing of Banker's Acceptances" means an advance to pay on the maturity of an accepted time draft.

6. Up to **$15,000,000.00** for **Clean Advances** of up to **maturity date of line.** "Clean Advance" means all Advances for a business purpose.

The definitions of trade terms in the Line Usage Sub-Limit Paragraphs 1 through 6, above, are for reference only, and are not intended to be inclusive. The actual usage may vary based on the structure of the trade finance transaction for which the instrument is issued.

# BUSINESS LOAN AGREEMENT
**(Continued)**

**Loan No: 3803238**                                                                                          **Page 6**

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.**

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury. To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**Judicial Reference.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge  appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including

# BUSINESS LOAN AGREEMENT
**(Continued)**

without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**Oral Agreements Not Effective.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**Facsimile or Other Image.** Delivery of an executed signature page of this Note or Agreement and all other Related Documents executed in connection with the Loan by facsimile or other electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Tatung Company of America, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical,

## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 3803238                                                                                                                Page 8

chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated June 7, 2017 and executed by Tatung Company of America, Inc. in the principal amount of $15,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED JUNE 7, 2017.

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
   Huei-Jihn Jih, President of Tatung Company of
   America, Inc.

LENDER:

EAST WEST BANK

By: _____
   Authorized Signer

# PROMISSORY NOTE

| Borrower: | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA  90810 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |

**Principal Amount: $15,000,000.00**                                   **Date of Note:  June 7, 2017**

**PROMISE TO PAY.**  Tatung Company of America, Inc. ("Borrower") promises to pay to East West Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Fifteen Million & 00/100 Dollars ($15,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance.  Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.**  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 7, 2018.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning July 7, 2017, with all subsequent interest payments to be due on the same day of each month after that.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the (one) 1 month London interbank offered rate ("LIBOR Rate"), determined and adjusted by Lender in accordance with the custom and practice for transactions in Eurodollars conducted in London, England and the provisions of this section.  Such interest rate shall be equivalent to Lender's LIBOR Rate which is that rate determined by Lender's Treasury Desk to be the Interbank lending rate for a period of 1-month which appears on the Bloomberg Screen B TMM Page under the heading "LIBOR Fix" as of 11:00 am (London Time) on the second Business Day prior to the Determination Date (adjusted for any and all assessments, surcharges and reserve requirements).  If such interest rate shall cease to be available from the described Bloomberg report, the London interbank offered rate shall be determined from such financial reporting service as Lender shall reasonably determine and use with respect to its other loan facilities on which interest is determined based on the London interbank offered rate.  The LIBOR Rate shall be adjusted to occur on the Determination Date (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each 1 month.  Borrower understands that Lender may make loans based on other rates as well.  **The Index currently is 1.096% per annum.**  Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.500 percentage points over the Index, resulting in an initial rate of 3.596%.  NOTICE:  Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.

**BUSINESS DAY.**  Any day other than a Saturday or a Sunday or any day on which commercial banks in Los Angeles, California, are authorized or required to close.

**DETERMINATION DATE.**  For purposes hereof, "Determination Date" shall mean July 7, 2017 and every one (1) month thereafter.

**PREPAYMENT; MINIMUM INTEREST CHARGE.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.  In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a **minimum interest charge of $100.00**.  Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  East West Bank, Loan Service Department, 9300 Flair Drive, 6th Floor El Monte, CA  91731.

**LATE CHARGE.**  If a payment is 11 days or more late, Borrower will be charged **6.000% of the unpaid portion of the regularly scheduled payment or $5.00, whichever is greater.**

**INTEREST AFTER DEFAULT.**  Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin").  The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**  Borrower fails to make any payment when due under this Note.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**  The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.  This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or

## PROMISSORY NOTE
### (Continued)

Loan No: 3803238                                                                                     Page 2

forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**OTHER DEFAULTS MODIFIED.** Notwithstanding the section above entitled "Other Defaults", Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or Agreement or in any of the Related Documents between Lender and Borrower; or any shareholder, member, trustor, or any owner of the Borrower also holding a controlling interest in any given entity's common stock, membership interest, trust interest, or any other ownership interest ("Related Entity"), fails to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and the Related Entity.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $25.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Deed of Trust dated June 7, 2017, to a trustee in favor of Lender on real property located in Los Angeles County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Borrower is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Borrower. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

(B) an Assignment of All Rents to Lender on real property located in Los Angeles County, State of California.

(C) inventory, chattel paper, accounts, equipment and general intangibles described in a Commercial Security Agreement dated June 7, 2017.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. All oral requests shall be confirmed in writing on the day of the request, on forms acceptable to Lender. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Huei-Jihn Jih, President of Tatung Company of**

## PROMISSORY NOTE
### (Continued)

Loan No: 3803238                                                                                              Page 3

═══════════════════════════════════════════════════════════════════════════════

**America, Inc.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**CERTIFICATION OF ACCURACY.** Borrower certifies under penalty of perjury that all financial documents provided to Lender, which may include income statements, balance sheets, accounts payable and receivable listings, inventory listings, rents rolls, and tax returns, are the most recent such documents prepared by Borrower, that they give a complete and accurate statement of the financial condition of Borrower, as of the dates of such statements, and that no material change has occurred since such time, except as disclosed to Lender in writing. Borrower agrees to notify Lender immediately of the extent and character of any material adverse change in the Borrower's financial condition. The financial documents shall constitute continuing representations of Borrower and shall be construed by Lender to be continuing statements of the financial condition of Borrower and to be new and original statement of all assets and liabilities of Borrower with respect to each advance under this Note and every other transaction in which Borrower becomes obligated to Lender until Borrower advises Lender to the contrary. The financial documents are being given to induce Lender to extend credit and Lender is relying upon such documents. Lender may verify with third parties any information contained in financial documents delivered to Lender, obtain information from others, and ask and answer questions and requests seeking credit experience about the undersigned.

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: East West Bank Loan Service Department P.O. Box 60021 City of Industry, CA 91716-0021.

**ORAL AGREEMENTS NOT EFFECTIVE.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**


**TATUNG COMPANY OF AMERICA, INC.**

By: _____

Huei-Jihn Jih, President of Tatung Company of America, Inc.

# COMMERCIAL SECURITY AGREEMENT

| | | | |
|---|---|---|---|
| **Grantor:** | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA 90810 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |

**THIS COMMERCIAL SECURITY AGREEMENT** dated June 7, 2017, is made and executed between Tatung Company of America, Inc. ("Grantor") and East West Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been

## COMMERCIAL SECURITY AGREEMENT
**(Continued)**

Loan No: 3803238                                                                                 **Page 2**

made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $10,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. This includes making sure Lender is shown as the first and only security interest holder on the title covering the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or ability to perform Grantor's obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

## COMMERCIAL SECURITY AGREEMENT
**Loan No: 3803238** (Continued) **Page 4**

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or guarantor, endorser, surety, or accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Oral Agreements Not Effective.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower

## COMMERCIAL SECURITY AGREEMENT
**(Continued)**

**Loan No: 3803238**                                                                                          **Page 6**

acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Tatung Company of America, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Tatung Company of America, Inc..

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Note.** The word "Note" means the Note dated June 7, 2017 and executed by Tatung Company of America, Inc. in the principal amount of $15,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JUNE 7, 2017.**

GRANTOR:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn Jin, President of Tatung Company of
America, Inc.

**RECORDATION REQUESTED BY:**
East West Bank

**WHEN RECORDED MAIL TO:**
East West Bank
Loan Servicing Department
9300 Flair Drive, 6th Floor
El Monte, CA  91731

**SEND TAX NOTICES TO:**
Tatung Company of America, Inc.
2850 East El Presidio Street
Carson, CA  90810

<u>FOR RECORDER'S USE ONLY</u>

# DEED OF TRUST

**Variable Interest Rate**
**Revolving Line of Credit**

**THIS DEED OF TRUST is dated June 7, 2017, among Tatung Company of America, Inc., a Corporation, whose address is 2850 East El Presidio Street, Carson, CA  90810 ("Trustor"); East West Bank, whose address is Loan Servicing Department, 9300 Flair Drive, 6th Floor, El Monte, CA  91731 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and EAST WEST INVESTMENT INC., A CALIFORNIA CORPORATION, whose address is 9300 Flair Drive, 6th Floor, El Monte, CA  91731 (referred to below as "Trustee").**

**CONVEYANCE AND GRANT.  For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary,** all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in Los Angeles County, State of California:**

> See Exhibit "A", which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

**The Real Property or its address is commonly known as  2850 East El Presidio Street, (Long Beach Area), Carson, CA  90810.  The Assessor's Parcel Number for the Real Property is 7306-005-040.**

REVOLVING LINE OF CREDIT.  This Deed of Trust secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Trustor so long as Trustor complies with all the terms of the Note.  Notwithstanding the amount outstanding at any particular time, this Deed of Trust secures the total amount of the Note.  The unpaid balance of the revolving line of credit under the Note may at certain times be Zero Dollars ($0.00).  A zero balance does not affect Lender's agreement to make advances to Trustor under the Note.  Therefore, Lender's interest under this Deed of Trust will remain in full force and effect notwithstanding a zero balance on the Note.

Trustor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Trustor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  This is an absolute assignment of Rents made in connection with an obligation secured by real property pursuant to California Civil Code Section 2938.  In addition, Trustor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF ANY AND ALL OBLIGATIONS OF THE TRUSTOR UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE.  Except as otherwise provided in this Deed of Trust, Trustor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Trustor's obligations under the Note, this Deed of Trust, and the Related Documents.

POSSESSION AND MAINTENANCE OF THE PROPERTY.  Trustor agrees that Trustor's possession and use of the Property shall be governed by the following provisions:

> Possession and Use.  Until the occurrence of an Event of Default, Trustor may  (1)  remain in possession and control of the Property;  (2)  use, operate or manage the Property; and  (3)  collect the Rents from the Property.

> Duty to Maintain.  Trustor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

> Compliance With Environmental Laws.  Trustor represents and warrants to Lender that:  (1)  During the period of Trustor's ownership

# DEED OF TRUST
## (Continued)

Loan No: 3803238

Page 2

---

of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Trustor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Trustor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Trustor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Trustor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Trustor or to any other person. The representations and warranties contained herein are based on Trustor's due diligence in investigating the Property for Hazardous Substances. Trustor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Trustor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Trustor's ownership or interest in the Property, whether or not the same was or should have been known to Trustor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Trustor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Trustor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Trustor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Trustor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Trustor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Trustor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Trustor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Trustor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Trustor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Trustor agrees neither to abandon or leave unattended the Property. Trustor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Trustor shall pay when due (and in all events at least ten (10) days prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Trustor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Trustor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Trustor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Trustor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Trustor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Trustor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Trustor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments

# DEED OF TRUST
**Loan No: 3803238**           **(Continued)**           **Page 3**

against the Property.

**Notice of Construction.** Trustor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $10,000.00. Trustor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Trustor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Trustor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Trustor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Trustor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Notwithstanding the foregoing, in no event shall Trustor be required to provide hazard insurance in excess of the replacement value of the improvements on the Real Property. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Trustor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Trustor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Trustor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Trustor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $10,000.00. Lender may make proof of loss if Trustor fails to do so within fifteen (15) days of the casualty. If in Lender's sole judgment Lender's security interest in the Property has been impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If the proceeds are to be applied to restoration and repair, Trustor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Trustor from the proceeds for the reasonable cost of repair or restoration if Trustor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Trustor as Trustor's interests may appear.

**Trustor's Report on Insurance.** Upon request of Lender, however not more than once a year, Trustor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Trustor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Trustor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Trustor's failure to discharge or pay when due any amounts Trustor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Trustor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Trustor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Trustor warrants that: (a) Trustor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Trustor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Trustor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Trustor's title or the interest of Trustee or Lender under this Deed of Trust, Trustor shall defend the action at Trustor's expense. Trustor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Trustor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Trustor warrants that the Property and Trustor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Trustor in this Deed of Trust

# DEED OF TRUST
## (Continued)

shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Trustor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to eminent domain and inverse condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any eminent domain or inverse condemnation proceeding is commenced affecting the Property, Trustor shall promptly notify Lender in writing, and Trustor shall promptly take such steps as may be necessary to pursue or defend the action and obtain the award. Trustor may be the nominal party in any such proceeding, but Lender shall be entitled, at its election, to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Trustor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If any award is made or settlement entered into in any condemnation proceedings affecting all or any part of the Property or by any proceeding or purchase in lieu of condemnation, Lender may at its election, and to the extent permitted by law, require that all or any portion of the award or settlement be applied to the Indebtedness and to the repayment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation proceedings.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Trustor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Trustor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Trustor which Trustor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Trustor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Trustor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Trustor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. Trustor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Trustor shall not remove, sever or detach the Personal Property from the Property. Upon default, Trustor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Trustor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Trustor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Trustor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Trustor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Trustor. Unless prohibited by law or Lender agrees to the contrary in writing, Trustor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Trustor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Trustor and at Trustor's expense. For such purposes, Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Trustor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Trustor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Trustor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Lender may charge Trustor a reasonable reconveyance fee at the time of reconveyance.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

# DEED OF TRUST
## (Continued)

**Payment Default.** Trustor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Trustor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Trustor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Trustor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Deed of Trust or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Trustor or on Trustor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Trustor's existence as a going business, the insolvency of Trustor, the appointment of a receiver for any part of Trustor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Trustor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trustor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Trustor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Trustor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Trustor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Trustor under the terms of any other agreement between Trustor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Trustor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Trustor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Right to Cure.** If any default, other than a default in payment, is curable and if Trustor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured if Trustor, after Lender sends written notice to Trustor demanding cure of such default:  (1)  cures the default within fifteen (15) days; or  (2)  if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Trustor under this Deed of Trust, after Trustor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Foreclosure by Sale.** Upon an Event of Default under this Deed of Trust, Beneficiary may declare the entire Indebtedness secured by this Deed of Trust immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold the Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the Note, other documents requested by Trustee, and all documents evidencing expenditures secured hereby. After the lapse of such time as may then be required by law following the recordation of the notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell the Property at the time and place fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement in accordance with applicable law. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary may purchase at such sale. After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of:  all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

**Judicial Foreclosure.** With respect to all or any part of the Real Property, Lender shall have the right in lieu of foreclosure by power of

# DEED OF TRUST
## (Continued)

**Loan No: 3803238**                                                                                          **Page 6**

sale to foreclose by judicial foreclosure in accordance with and to the full extent provided by California law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including without limitation the right to recover any deficiency in the manner and to the full extent provided by California law.

**Collect Rents.** Lender shall have the right, without notice to Trustor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Trustor irrevocably designates Lender as Trustor's attorney-in-fact to endorse instruments received in payment thereof in the name of Trustor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Trustor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Trustor, Trustor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Notice of Sale.** Lender shall give Trustor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Trustor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Trustor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Trustor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of Los Angeles County, State of California. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Trustor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for

# DEED OF TRUST
**(Continued)**

substitution.

**Acceptance by Trustee.**  Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**NOTICES.**  Any notice required to be given under this Deed of Trust shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust.  Trustor requests that copies of any notices of default and sale be directed to Trustor's address shown near the beginning of this Deed of Trust.  All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust.  Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Trustor agrees to keep Lender informed at all times of Trustor's current address.  Unless otherwise provided or required by law, if there is more than one Trustor, any notice given by Lender to any Trustor is deemed to be notice given to all Trustors.

**STATEMENT OF OBLIGATION FEE.**  Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**JUDICIAL REFERENCE.**  If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge  appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers.  All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings.  The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**ORAL AGREEMENTS NOT EFFECTIVE.**  This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section.  Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**CHOICE OF VENUE.**  If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.**  This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust.  No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.**  If the Property is used for purposes other than Trustor's residence, Trustor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Trustor's previous fiscal year in such form and detail as Lender shall require.  "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in

# DEED OF TRUST
## (Continued)

connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law. This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of California.**

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Trustor, shall constitute a waiver of any of Lender's rights or of any of Trustor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Trustor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Trustor, Lender, without notice to Trustor, may deal with Trustor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Trustor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**Waive Jury. To the extent permitted by applicable law, all parties to this Deed of Trust hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means East West Bank, and its successors and assigns.

**Borrower.** The word "Borrower" means Tatung Company of America, Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Trustor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note

# DEED OF TRUST
## (Continued)

**Loan No: 3803238**                                                                 **Page 9**

or Related Documents and any amounts expended or advanced by Lender to discharge Trustor's obligations or expenses incurred by Trustee or Lender to enforce Trustor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Note.** The word "Note" means the promissory note dated June 7, 2017, **in the original principal amount of $15,000,000.00** from Trustor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. **NOTICE TO TRUSTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Trustor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property. However, should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Personal Property is limited to only those items specifically covered (currently or hereafter) by Coverage A of the standard flood insurance policy issued in accordance with the National Flood Insurance Program or under equivalent coverage similarly issued by a private insurer to satisfy the National Flood Insurance Act (as amended).

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness; except that the words do not mean any guaranty or environmental agreement, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future leases, rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property together with the cash proceeds of the Rents.

**Trustee.** The word "Trustee" means EAST WEST INVESTMENT INC., A CALIFORNIA CORPORATION, whose address is 9300 Flair Drive, 6th Floor, El Monte, CA 91731 and any substitute or successor trustees.

**Trustor.** The word "Trustor" means Tatung Company of America, Inc..

**TRUSTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND TRUSTOR AGREES TO ITS TERMS, INCLUDING THE VARIABLE RATE PROVISIONS OF THE NOTE SECURED BY THIS DEED OF TRUST.**

**TRUSTOR:**

TATUNG COMPANY OF AMERICA, INC.

By: _____
    Huei-Jihn Jih, President of Tatung Company of America, Inc.

| Loan No: 3803238 | **DEED OF TRUST**<br>**(Continued)** | Page **10** |
|---|---|---|

## CERTIFICATE OF ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF _California_                                     )
                                                          ) SS
COUNTY OF _Los Angeles_                                   )

On _June 15th, 2017_ , 20____ before me, _Stephen Luong, Notary Public_ ,
                                                    (here insert name and title of the officer)

personally appeared **Huei-Jihn Jih**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

STEPHEN LUONG
Notary Public – California
Los Angeles County
Commission # 2179551
My Comm. Expires Jan 13, 2021

(Seal)

## (DO NOT RECORD)
## REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To: _____, Trustee

The undersigned is the legal owner and holder of all Indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

_____.

Date: _____    Beneficiary: _____

                                            By: _____

                                            Its: _____

LaserPro, Ver. 17.1.10.015  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFI\LPL\G01.FC
TR-26627  PR-7

**RECORDATION REQUESTED BY:**
East West Bank

**WHEN RECORDED MAIL TO:**
East West Bank
Loan Servicing Department
9300 Flair Drive, 6th Floor
El Monte, CA  91731

**SEND TAX NOTICES TO:**
Tatung Company of America, Inc.
2850 East El Presidio Street
Carson, CA  90810

_____

FOR RECORDER'S USE ONLY

## ASSIGNMENT OF RENTS

**THIS ASSIGNMENT OF RENTS** dated June 7, 2017, is made and executed between Tatung Company of America, Inc., a Corporation, whose address is 2850 East El Presidio Street, Carson, CA  90810 (referred to below as "Grantor") and East West Bank, whose address is 9300 Flair Drive, 6th Floor, El Monte, CA  91731 (referred to below as "Lender").

**ASSIGNMENT.  For** valuable consideration, Grantor hereby assigns, grants a continuing security interest in, and conveys to Lender all of Grantor's right, title, and interest in and to the Rents from the following described Property located in Los Angeles County, State of California:

See Exhibit "A", which is attached to this Assignment and made a part of this Assignment as if fully set forth herein.

**The Property or its address is commonly known as  2850 East El Presidio Street, (Long Beach Area), Carson, CA  90810.  The Assessor's Parcel Number for the Property is 7306-005-040.**

**This is an absolute assignment of Rents made in connection with an obligation secured by property pursuant to California Civil Code section 2938.**

REVOLVING LINE OF CREDIT.  This Assignment secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Note.  Notwithstanding the amount outstanding at any particular time, this Assignment secures the total amount of the Note.  The unpaid balance of the revolving line of credit under the Note may at certain times be Zero Dollars ($0.00).  A zero balance does not affect Lender's agreement to make advances to Grantor under the Note.  Therefore, Lender's interest under this Assignment will remain in full force and effect notwithstanding a zero balance on the Note.

THIS ASSIGNMENT IS GIVEN TO SECURE   (1) PAYMENT OF THE INDEBTEDNESS AND   (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF GRANTOR UNDER THE NOTE, THIS ASSIGNMENT, AND THE RELATED DOCUMENTS.  THIS ASSIGNMENT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE.  Except as otherwise provided in this Assignment or any Related Documents, Grantor shall pay to Lender all amounts secured by this Assignment as they become due, and shall strictly perform all of Grantor's obligations under this Assignment.  Unless and until Lender exercises its right to collect the Rents as provided below and so long as there is no default under this Assignment, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents, provided that the granting of the right to collect the Rents shall not constitute Lender's consent to the use of cash collateral in a bankruptcy proceeding.

GRANTOR'S REPRESENTATIONS AND WARRANTIES.  Grantor warrants that:

Ownership.  Grantor is entitled to receive the Rents free and clear of all rights, loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

Right to Assign.  Grantor has the full right, power and authority to enter into this Assignment and to assign and convey the Rents to Lender.

No Prior Assignment.  Grantor has not previously assigned or conveyed the Rents to any other person by any instrument now in force.

No Further Transfer.  Grantor will not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Rents except as provided in this Assignment.

LENDER'S RIGHT TO RECEIVE AND COLLECT RENTS.  Lender shall have the right at any time, and even though no default shall have occurred under this Assignment, to collect and receive the Rents.  For this purpose, Lender is hereby given and granted the following rights, powers and authority:

Notice to Tenants.  Lender may send notices to any and all tenants of the Property advising them of this Assignment and directing all Rents to be paid directly to Lender or Lender's agent.

Enter the Property.  Lender may enter upon and take possession of the Property; demand, collect and receive from the tenants or from any other persons liable therefor, all of the Rents; institute and carry on all legal proceedings necessary for the protection of the

# ASSIGNMENT OF RENTS
**(Continued)**

Property, including such proceedings as may be necessary to recover possession of the Property; collect the Rents and remove any tenant or tenants or other persons from the Property.

**Maintain the Property.** Lender may enter upon the Property to maintain the Property and keep the same in repair; to pay the costs thereof and of all services of all employees, including their equipment, and of all continuing costs and expenses of maintaining the Property in proper repair and condition, and also to pay all taxes, assessments and water utilities, and the premiums on fire and other insurance effected by Lender on the Property.

**Compliance with Laws.** Lender may do any and all things to execute and comply with the laws of the State of California and also all other laws, rules, orders, ordinances and requirements of all other governmental agencies affecting the Property.

**Lease the Property.** Lender may rent or lease the whole or any part of the Property for such term or terms and on such conditions as Lender may deem appropriate.

**Employ Agents.** Lender may engage such agent or agents as Lender may deem appropriate, either in Lender's name or in Grantor's name, to rent and manage the Property, including the collection and application of Rents.

**Other Acts.** Lender may do all such other things and acts with respect to the Property as Lender may deem appropriate and may act exclusively and solely in the place and stead of Grantor and to have all of the powers of Grantor for the purposes stated above.

**No Requirement to Act.** Lender shall not be required to do any of the foregoing acts or things, and the fact that Lender shall have performed one or more of the foregoing acts or things shall not require Lender to do any other specific act or thing.

**APPLICATION OF RENTS.** All costs and expenses incurred by Lender in connection with the Property shall be for Grantor's account and Lender may pay such costs and expenses from the Rents. Lender, in its sole discretion, shall determine the application of any and all Rents received by it; however, any such Rents received by Lender which are not applied to such costs and expenses shall be applied to the Indebtedness. All expenditures made by Lender under this Assignment and not reimbursed from the Rents shall become a part of the Indebtedness secured by this Assignment, and shall be payable on demand, with interest at the Note rate from date of expenditure until paid.

**FULL PERFORMANCE.** If Grantor pays all of the Indebtedness when due and otherwise performs all the obligations imposed upon Grantor under this Assignment, the Note, and the Related Documents, Lender shall execute and deliver to Grantor a suitable satisfaction of this Assignment and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Property. Any termination fee required by law shall be paid by Grantor, if permitted by applicable law.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Assignment or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Assignment or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Rents or the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Assignment also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Assignment:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Assignment or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default on Other Payments.** Failure of Grantor within the time required by this Assignment to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or ability to perform Grantor's obligations under this Assignment or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Assignment or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Assignment or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against the Rents or any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by

## ASSIGNMENT OF RENTS
**(Continued)**

Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Property Damage or Loss.**  The Property is lost, stolen, substantially damaged, sold, or borrowed against.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.**  A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.**  If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Assignment within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default:  (1)  cures the default within fifteen (15) days; or  (2)  if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.**  Upon the occurrence of any Event of Default and at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.**  Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment fee that Grantor would be required to pay.

**Collect Rents.**  Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness.  In furtherance of this right, Lender shall have all the rights provided for in the Lender's Right to Receive and Collect Rents Section, above.  If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds.  Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed.  Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.**  Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.  The receiver may serve without bond if permitted by law.  Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount.  Employment by Lender shall not disqualify a person from serving as a receiver.

**Other Remedies.**  Lender shall have all other rights and remedies provided in this Assignment or the Note or by law.

**Election of Remedies.**  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Assignment, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Attorneys' Fees; Expenses.**  If Lender institutes any suit or action to enforce any of the terms of this Assignment, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal.  Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid.  Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law.  Grantor also will pay any court costs, in addition to all other sums provided by law.

**CHOICE OF VENUE.**  If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**JUDICIAL REFERENCE.**  If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge  appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts).  The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive.  The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers.  All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed.  If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief.  The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings.  The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings.  The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge.  The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a).  Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose

# ASSIGNMENT OF RENTS
**Loan No: 3803238**                                **(Continued)**                                **Page 4**

against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**ORAL AGREEMENTS NOT EFFECTIVE.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Assignment:

**Amendments.** This Assignment, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Assignment. No alteration of or amendment to this Assignment shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Caption Headings.** Caption headings in this Assignment are for convenience purposes only and are not to be used to interpret or define the provisions of this Assignment.

**Governing Law.** This Assignment will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Assignment has been accepted by Lender in the State of California.

**Merger.** There shall be no merger of the interest or estate created by this Assignment with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Interpretation.** (1)  In all cases where there is more than one Borrower or Grantor, then all words used in this Assignment in the singular shall be deemed to have been used in the plural where the context and construction so require.  (2)  If more than one person signs this Assignment as "Grantor," the obligations of each Grantor are joint and several. This means that if Lender brings a lawsuit, Lender may sue any one or more of the Grantors. If Borrower and Grantor are not the same person, Lender need not sue Borrower first, and that Borrower need not be joined in any lawsuit.  (3)  The names given to paragraphs or sections in this Assignment are for convenience purposes only. They are not to be used to interpret or define the provisions of this Assignment.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Assignment unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Assignment shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Assignment. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Assignment, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Assignment shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Assignment. Any party may change its address for notices under this Assignment by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Powers of Attorney.** The various agencies and powers of attorney conveyed on Lender under this Assignment are granted for purposes of security and may not be revoked by Grantor until such time as the same are renounced by Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Assignment to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Assignment. Unless otherwise required by law, the illegality,

## ASSIGNMENT OF RENTS
### (Continued)

invalidity, or unenforceability of any provision of this Assignment shall not affect the legality, validity or enforceability of any other provision of this Assignment.

**Successors and Assigns.** Subject to any limitations stated in this Assignment on transfer of Grantor's interest, this Assignment shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Assignment and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Assignment or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Assignment.

**Waive Jury. To the extent permitted by applicable law, all parties to this Assignment hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS ASSIGNMENT, GRANTOR HEREBY WAIVES ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR JUDGMENT OF FORECLOSURE ON GRANTOR'S BEHALF AND ON BEHALF OF EACH AND EVERY PERSON, EXCEPT JUDGMENT CREDITORS OF GRANTOR, ACQUIRING ANY INTEREST IN OR TITLE TO THE PROPERTY SUBSEQUENT TO THE DATE OF THIS ASSIGNMENT.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Assignment. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Assignment shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Assignment.** The word "Assignment" means this ASSIGNMENT OF RENTS, as this ASSIGNMENT OF RENTS may be amended or modified from time to time, together with all exhibits and schedules attached to this ASSIGNMENT OF RENTS from time to time.

**Borrower.** The word "Borrower" means Tatung Company of America, Inc..

**Default.** The word "Default" means the Default set forth in this Assignment in the section titled "Default".

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Assignment in the default section of this Assignment.

**Grantor.** The word "Grantor" means Tatung Company of America, Inc..

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Assignment, together with interest on such amounts as provided in this Assignment.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Note.** The word "Note" means the promissory note dated June 7, 2017, **in the original principal amount of $15,000,000.00** from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Assignment" section of this Assignment.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness; except that the words do not mean any guaranty or environmental agreement, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all of Grantor's present and future rights, title and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property, and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation Grantor's right to enforce such leases and to receive and collect payment and proceeds thereunder.

**THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS ASSIGNMENT, AND NOT PERSONALLY BUT AS AN AUTHORIZED SIGNER, HAS CAUSED THIS ASSIGNMENT TO BE SIGNED AND EXECUTED ON BEHALF OF GRANTOR ON JUNE 7, 2017.**

GRANTOR:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn Jih, President of Tatung Company of America, Inc.

**Loan No: 3803238**

## ASSIGNMENT OF RENTS
## (Continued)

Page 6

---

## CERTIFICATE OF ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF ___California___ )

) SS

COUNTY OF ___Los Angeles___ )

On __June 15th__, 20_17_ before me, __Stephen Luong, Notary Public__,

(here insert name and title of the officer)

personally appeared **Huei-Jihn Jih**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

**WITNESS my hand and official seal.**

**Signature** _____

STEPHEN LUONG
Notary Public – California
Los Angeles County
Commission # 2179551
My Comm. Expires Jan 13, 2021

(Seal)

---

LaserPro, Ver. 17.1.10.015 Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.   - CA  E:\PROD\LOANDOC\CFI\LPL\G14.FC
TR-26627 PR-7

# AGREEMENT TO PROVIDE INSURANCE

| | | | |
|---|---|---|---|
| **Grantor:** | **Tatung Company of America, Inc.**<br>**2850 East El Presidio Street**<br>**Carson, CA  90810** | **Lender:** | **East West Bank**<br>**Loan Servicing Department**<br>**9300 Flair Drive, 6th Floor**<br>**El Monte, CA  91731** |

**INSURANCE REQUIREMENTS.**  Grantor, Tatung Company of America, Inc. ("Grantor"), understands that insurance coverage is required in connection with the extending of a loan or the providing of other financial accommodations to Grantor by Lender.  These requirements are set forth in the security documents for the loan.  The following minimum insurance coverages must be provided on the following described collateral (the "Collateral"):

    **Collateral:**    **All Inventory and Equipment.**
             **Type:**  All risks, including fire, theft and liability.
             **Amount:**  Full Insurable Value.
             **Basis:**  Replacement value.
             **Endorsements:**  Lender loss payable clause with stipulation that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender.
             **Comments:**  Lender's Loss Payable Endorsement to read:  East West Bank, its successors and/or assigns, at P.O. Box 60021, City of Industry, CA 91716-0021.

             Business personal property insurance shall not be less than $9,000,000.00.

             Loan No. as indicated on your Note to be listed on the Policy.
             **Latest Delivery Date:**  By the loan closing date.

    **Collateral:**    **2850 East El Presidio Street, (Long Beach Area), Carson, CA  90810.**
             **Type:**  Fire and extended coverage.
             **Amount:**  Full Insurable Value; however in no event greater than the value of the replacement cost of the improvements.
             **Basis:**  Replacement value.
             **Endorsements:**  Standard mortgagee's clause with stipulation that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender, and without disclaimer of the insurer's liability for failure to give such notice.
             **Comments:**  Lender's Loss Payable Endorsement to read:  East West Bank, its successors and/or assigns, at P.O. Box 60021, City of Industry, CA 91716-0021.

             **DEDUCTIBLE.**  Not to exceed $50,000.00.

             Loan No. as indicated on your Note to be listed on the Policy.
             **Latest Delivery Date:**  By the loan closing date.

**INSURANCE COMPANY.**  Grantor may obtain insurance from any insurance company Grantor may choose that is reasonably acceptable to Lender.  Grantor understands that credit may not be denied solely because insurance was not purchased through Lender.

**FLOOD INSURANCE.**  Flood Insurance for the Collateral securing this loan is described as follows:

    **Real Estate at 2850 East El Presidio Street, (Long Beach Area), Carson, CA  90810.**
    The Collateral securing this loan is not currently located in an area identified as having special flood hazards.  Therefore, no special flood hazard insurance is necessary at this time.  Should the Collateral at any time be deemed to be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Collateral is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.  Flood insurance may be purchased under the National Flood Insurance Program or from private insurers.

**INSURANCE MAILING ADDRESS.**  All documents and other materials relating to insurance for this loan should be mailed, delivered or directed to the following address:

    **East West Bank**
    **Loan Service Department - Insurance**
    **P.O. Box 60021**
    **City of Industry, CA  91716-0021**

**FAILURE TO PROVIDE INSURANCE.**  Grantor agrees to deliver to Lender, on the latest delivery date stated above, proof of the required insurance as provided above, with an effective date of June 7, 2017, or earlier.  Grantor acknowledges and agrees that if Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may do so at Grantor's expense as provided in the applicable security document.  The cost of any such insurance, at the option of Lender, shall be added to the indebtedness as provided in the security document.  GRANTOR ACKNOWLEDGES THAT IF LENDER SO PURCHASES ANY SUCH INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE DEBT, EXCLUDING ANY UNEARNED FINANCE CHARGES, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, GRANTOR'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED.  IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

**AUTHORIZATION.**  For purposes of insurance coverage on the Collateral, Grantor authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Collateral, the loan or other financial accommodations, or both.

# AGREEMENT TO PROVIDE INSURANCE
## (Continued)

Loan No: 3803238                                                                    Page 2

═══════════════════════════════════════════════════════════════════════════════════

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT TO PROVIDE INSURANCE AND AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED JUNE 7, 2017.

GRANTOR:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn  Jih,  President  of  Tatung  Company  of
America, Inc.

┌─────────────────────────────────────────────────────────────────────────────────┐
│                              FOR LENDER USE ONLY                                  │
│                            INSURANCE VERIFICATION                                 │
│  DATE: _____              PHONE _____│
│  _____                                                                 │
│  AGENT'S NAME: _____                               │
│  AGENCY: _____                        │
│  ADDRESS: _____│
│  INSURANCE COMPANY: _____                 │
│  POLICY NUMBER: _____                                  │
│  EFFECTIVE DATES: _____│
│  _____ │
│  COMMENTS: _____ │
│  _____ │
│  _____ │
├─────────────────────────────────────────────────────────────────────────────────┤
│                              FOR LENDER USE ONLY                                  │
│                            INSURANCE VERIFICATION                                 │
│  DATE: _____              PHONE _____│
│  _____                                                                 │
│  AGENT'S NAME: _____                               │
│  AGENCY: _____                        │
│  ADDRESS: _____│
│  INSURANCE COMPANY: _____                 │
│  POLICY NUMBER: _____                                  │
│  EFFECTIVE DATES: _____│
│  _____ │
│  COMMENTS: _____ │
│  _____ │
└─────────────────────────────────────────────────────────────────────────────────┘

# DISBURSEMENT REQUEST AND AUTHORIZATION

| **Borrower:** | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA  90810 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

**LOAN TYPE.**  This is a Variable Rate Nondisclosable Revolving Line of Credit Loan to a Corporation for $15,000,000.00 due on June 7, 2018.

**PRIMARY PURPOSE OF LOAN.**  The primary purpose of this loan is for:

☐ **Personal, Family, or Household Purposes or Personal Investment.**

☒ **Business (Including Real Estate Investment).**

**SPECIFIC PURPOSE.**  The specific purpose of this loan is:  Working Capital.

**FLOOD INSURANCE.**  As reflected on Flood Map No. 06037C1955F dated 09-26-2008, for the community of City of Carson, some of the property that will secure the loan is not located in an area that has been identified by the Administrator of the Federal Emergency Management Agency as an area having special flood hazards.  Therefore, although flood insurance may be available for the property, no special flood hazard insurance protecting property not located in an area having special flood hazards is required by law for this loan at this time.

**DISBURSEMENT INSTRUCTIONS.**  Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied.  Please disburse the loan proceeds of $15,000,000.00 as follows:

| | |
|---|---|
| **Undisbursed Funds:** | $4,550,000.00 |
| **Other Disbursements:**<br>$3,500,000.00 Payoff Bank of Taiwan (Estimate)<br>$6,950,000.00 Payoff Mega International (Estimate) | $10,450,000.00 |
| **Note Principal:** | $15,000,000.00 |

**CHARGES PAID IN CASH.**  Borrower has paid or will pay in cash as agreed the following charges:

| | |
|---|---|
| **Prepaid Finance Charges Paid in Cash:**<br>$4.00  Life of Loan Flood Fee<br>$250.00  Processing Fees<br>$98.00  Tax Service Fee | $352.00 |
| **Other Charges Paid in Cash:**<br>$9.00  Initial Flood Certification Fee<br>$100.00  Recording Fee (Estimate)<br>$5,000.00  Title Insurance Fee (Estimate)<br>$150.00  UCC Fees<br>$800.00  Documentation Fees<br>$2,300.00  Appraisal Fee<br>$600.00  EWB Appraisal Review Fee<br>$4,592.34  Collateral Audit Fee | ~~$13,551.34~~  $11,255 |
| *$2,296 ᵘⁿ* | |
| **Total Charges Paid in Cash:** | ~~$13,903.34~~  $11,607 |

**AUTOMATIC PAYMENTS.**  Borrower hereby authorizes Lender automatically to deduct from Borrower's Demand Deposit - Checking account, numbered 8063-12986, the amount of any loan payment.  If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment.  At any time and for any reason, Borrower or Lender may voluntarily terminate Automatic Payments.

**LOAN FEE DEDUCTION.**  Borrower authorizes Lender to deduct the fees and any other third party costs and expenses related to the Loan and charges above from Borrower's checking account number _____ with Lender, all without further consent of Borrower.  Lender is fully entitled to take such actions even if Borrower gives contrary instructions or demands to Lender.

**REQUEST FOR ADVANCE.**  All requests for Advances and line pay downs received in Lender's Loan Service Dept. at 9300 Flair Drive, 6th Floor, El Monte, CA 91731 after 4:00 p.m. will be treated as having been requested on the next succeeding business day.

Any (2) of the following individuals are authorized to request advances and authorize payments under this loan, and take all additional actions such individual(s) may deem necessary or appropriate to implement the provisions of the documents relating to this loan.  The individuals named below hold the titles appearing after their respective names, and true specimens of their signatures appear after their respective names below.

| | |
|---|---|
| Huei-Jihn Jih, President<br>Name/Title | Signature |
| Kuo Shu Huang, CFO<br>Name/Title | Signature |
| _____<br>Name/Title | _____<br>Signature |
| _____<br>Name/Title | _____<br>Signature |

## DISBURSEMENT REQUEST AND AUTHORIZATION
### (Continued)

| Loan No: 3803238 | | Page 2 |
|---|---|---|

FINANCIAL CONDITION.    BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER.    THIS AUTHORIZATION IS DATED JUNE 7, 2017.

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
   Huei-Jihn Jih, President of Tatung Company of
   America, Inc.

LaserPro, Ver. 17.1.10.015  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFI\LPL\I20.FC  TR-26627  PR-7

# NOTICE OF FINAL AGREEMENT

| **Borrower:** | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA  90810 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |

**BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES,   (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND  (C) THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

As used in this Notice, the following terms have the following meanings:

**Loan.**  The term "Loan" means the following described loan:  a Variable Rate Nondisclosable Revolving Line of Credit Loan to a Corporation for $15,000,000.00 due on June 7, 2018.

**Loan Agreement.**  The term "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, relating to the Loan, including without limitation the following:

## LOAN DOCUMENTS

- Disclosure of Right to Receive a Copy of an Appraisal
- Corporate Resolution: Tatung Company of America, Inc.
- Promissory Note
- CA Deed of Trust for Real Property located at 2850 East El Presidio Street, (Long Beach Area), Carson, CA  90810
- Agreement to Provide Insurance
- Notice of Final Agreement
- Hazard Insurance Disclosure - CA
- Business Loan Agreement
- CA Commercial Security Agreement: Collateral owned by Tatung Company of America, Inc.
- CA Assignment of Rents
- Disbursement Request and Authorization

**Parties.**  The term "Parties" means East West Bank and any and all entities or individuals who are obligated to repay the loan or have pledged property as security for the Loan, including without limitation the following:

| Borrower: | Tatung Company of America, Inc. |
| Grantor(s): | Tatung Company of America, Inc. |

Each Party who signs below, other than East West Bank, acknowledges, represents, and warrants to East West Bank that it has received, read and understood this Notice of Final Agreement.  This Notice is dated June 7, 2017.

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn Jih, President of Tatung Company of America, Inc.

LENDER:

EAST WEST BANK

x _____
Authorized Signer

# NOTICE OF FINAL AGREEMENT

| Borrower: | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA  90810 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

---

**BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES,   (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND   (C) THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

As used in this Notice, the following terms have the following meanings:

**Loan.**  The term "Loan" means the following described loan:  a Variable Rate Nondisclosable Revolving Line of Credit Loan to a Corporation for $15,000,000.00 due on June 7, 2018.

**Loan Agreement.**  The term "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, relating to the Loan, including without limitation the following:

## LOAN DOCUMENTS

- Disclosure of Right to Receive a Copy of an Appraisal
- Corporate Resolution: Tatung Company of America, Inc.
- Promissory Note
- CA Deed of Trust for Real Property located at 2850 East El Presidio Street, (Long Beach Area), Carson, CA  90810
- Agreement to Provide Insurance
- Notice of Final Agreement
- Hazard Insurance Disclosure - CA
- Business Loan Agreement
- CA Commercial Security Agreement: Collateral owned by Tatung Company of America, Inc.
- CA Assignment of Rents
- Disbursement Request and Authorization

**Parties.**  The term "Parties" means East West Bank and any and all entities or individuals who are obligated to repay the loan or have pledged property as security for the Loan, including without limitation the following:

    Borrower:      Tatung Company of America, Inc.
    Grantor(s):    Tatung Company of America, Inc.

---

Each Party who signs below, other than East West Bank, acknowledges, represents, and warrants to East West Bank that it has received, read and understood this Notice of Final Agreement.  This Notice is dated June 7, 2017.

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn Jih, President  of  Tatung  Company  of
America, Inc.

LENDER:

EAST WEST BANK

X_____
Authorized Signer

# CHANGE IN TERMS AGREEMENT

| Borrower: | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA  90810 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

**Principal Amount: $12,000,000.00**                    **Date of Agreement:  September 17, 2018**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**  The Promissory Note dated **June 7, 2017** for Loan Number 3803238 in the original Principal Amount of $15,000,000.00, along with any and all subsequent Change in Terms Agreements (collectively referred to as "Note").

**DESCRIPTION OF CHANGE IN TERMS.**

The maturity date of the Note is hereby extended from September 7, 2018 to September 7, 2019.

The principal amount of the Note is hereby decreased to Twelve Million & 00/100 Dollars ($12,000,000.00).

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**TATUNG COMPANY OF AMERICA, INC.**

By: _____
Huei-Jhin Jih, President of Tatung Company of
America, Inc.

# NOTICE OF FINAL AGREEMENT

| | | | |
|---|---|---|---|
| **Borrower:** | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA 90810 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |

BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES,  (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND  (C) THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

As used in this Notice, the following terms have the following meanings:

Loan.  The term "Loan" means the following described loan:  Loan No. 3803238.

Loan Agreement.  The term "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, relating to the Loan, together with any subsequent written modification documents for this Loan evidenced by all Notice of Final Agreements executed in regards to the Loan, and including without limitation the following:

## LOAN DOCUMENTS

- Change In Terms Agreement
- Modification to the Loan Agreement
- Disbursement Request and Authorization
- Notice of Final Agreement

Parties.  The term "Parties" means East West Bank and any and all entities or individuals who are obligated to repay the loan or have pledged property as security for the Loan, including without limitation the undersigned.

Each Party who signs below, other than East West Bank, acknowledges, represents, and warrants to East West Bank that it has received, read and understood this Notice of Final Agreement.  This Notice is dated as of September 17, 2018.

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
    Huei-Jihh Jih,  President of Tatung Company of
    America, Inc.

GRANTOR:

TATUNG COMPANY OF AMERICA, INC.

By: _____
    Huei-Jihh Jih,  President of Tatung Company of
    America, Inc.

LENDER:

EAST WEST BANK

X _____
    Authorized Signer

LaserPro, Ver. 18.2.0.027  Copr. Finastra USA Corporation 1997, 2018.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFILPL\G69.FC  TR-26627  PR-7

# SECOND MODIFICATION TO THE LOAN AGREEMENT

| Borrower: | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA 90810 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |
|---|---|---|---|

This **SECOND MODIFICATION TO THE LOAN AGREEMENT** is attached to and by this reference is made a part of the Business Loan Agreement (Loan #3803238) dated June 7, 2017, including all modifications thereto, and executed in connection with a loan or other financial accommodations between Lender and Borrower.

The section entitled "**Financial Statements**" is hereby restated as follows:

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** Borrower understands and agrees that while this Agreement is in effect, Borrower will maintain a financial condition indicated by the following statements at all times, unless otherwise noted;

**Annual Statements.** As soon as available, but in no event later than **one hundred twenty (120) days** after the end of each fiscal year, Borrower shall provide Lender with Borrower's balance sheet, income and expense statements, reconciliation of net worth and statement of cash flows, with notes thereto for the year ended, **audited** by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than **forty five (45) days** after the end of each fiscal quarter, Borrower shall provide Lender with balance sheet, income and expense statements, reconciliation of net worth and statement of cash flows, with notes thereto for the period ended, **prepared** by Borrower.

**Agings.** Within **thirty (30) days**, or sooner, after the end of each fiscal quarter, Borrower shall provide Lender with a listing and aging by invoice date of all accounts receivable and all accounts payable in detailed format acceptable to Lender.

**Inventory.** Within **thirty (30) days**, or sooner, after the end of each fiscal quarter, Borrower shall provide Lender with a listing of inventory in detailed format acceptable to Lender.

**Debtor Information.** On an annual basis, a listing (as of December 31st of each calendar year) of all Account Debtors including but not limited to their addresses and telephone numbers.

**Accounts Receivable Verification.** On an annual basis, Borrower shall provide Lender with an accounts receivable verification in detailed format acceptable to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

The section entitled "**Certification of Beneficial Owner(s)**" is hereby added under the section entitled "**REPRESENTATIONS AND WARRANTIES**" as follows:

**Certification of Beneficial Owner(s).** If Borrower is requested by Lender to provide a Certification of Beneficial Owner(s), the information included in the Certification of Beneficial Owner(s) is true and correct in all respects. "Certification of Beneficial Owner(s)" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially in form and substance satisfactory to Lender. "Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

The section entitled "**Compliance with "Know Your Customer" Requirements**" is hereby added under the section entitled "**AFFIRMATIVE COVENANTS**" as follows:

**Compliance with "Know Your Customer" Requirements.** Promptly following any request therefore, Borrower shall provide information and documentation reasonably requested by Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act, the Beneficial Ownership Regulation or other applicable anti-money laundering laws, including but not limited to a Certificate of Beneficial Owner(s) acceptable to Lender if applicable.

The section entitled "**USA PATRIOT ACT**" is hereby added as follows:

**USA PATRIOT ACT.** Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Act. Borrower shall, promptly following a request by Lender, provide all documentation and other information that Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act. For legal entity borrowers, Lender will require the legal entity to provide identifying information about each beneficial owner and/or individuals who have significant responsibility to control, manage or direct the legal entity.

The section entitled "**LINE USAGE**" is hereby amended and restated as follows:

**LINE USAGE.** The usage of the Loan shall be governed by the following sub-limits with:

**Maximum aggregate amount that may be outstanding under all sub-limits (items 1 through 6): $12,000,000.00.
The Maximum aggregate amount that may be outstanding under sub-limits (items 3 through 6): $12,000,000.00.**

1. Up to **$5,000,000.00** for issuance of **Sight Letters of Credit**. A "Sight Letter of Credit" means a Letter of Credit (a formal letter that authorizes a third party "beneficiary" to draw drafts on the Lender, under conditions stated in the letter which often require presentation of required documents in order, under applicable law, hereinafter referred to as "Letter of Credit") issued by Lender for Borrower that are payable upon draft by the beneficiary, provided the terms of the Letter of Credit are met.

2. Up to **$5,000,000.00** for issuance of **Usance Letters of Credit**. A "Usance Letter of Credit" means a Letter of Credit that is payable on a specific date after draft by the beneficiary, provided the terms of the Letter of Credit are met.

3. Up to **$2,000,000.00** for **Banker's Acceptances**. A "Banker's Acceptance" is a promised future payment, or time draft, which is accepted by Lender, often in connection with a Usance Letter of Credit.

4. Up to **$5,000,000.00** for advances of up to 90 days for **Trust Receipt Financing**. "Trust Receipt Financing" means an Advance to pay for release of goods to Borrower based upon title in favor of Lender to the released goods.

5. Up to **$5,000,000.00** for advances of up to 90 days for **Trust Receipt Financing** of Banker's Acceptances due and payable under Letters of

## SECOND MODIFICATION TO THE LOAN AGREEMENT
### (Continued)

**Loan No: 3803238**                                                                                                                                    **Page 2**

---

Credit issued and accepted by Lender with the term of the Advance reduced by the tenor of the usance draft.    The words "Trust Receipt Financing of Banker's Acceptances" means an advance to pay on the maturity of an accepted time draft.

6. Up to **$12,000,000.00** for Clean Advances of up to maturity date of line.  "Clean Advance" means all Advances for a business purpose.

The definitions of trade terms in the Line Usage Sub-Limit Paragraphs 1 through 6, above, are for reference only, and are not intended to be inclusive. The actual usage may vary based on the structure of the trade finance transaction for which the instrument is issued.

**THIS SECOND MODIFICATION TO THE LOAN AGREEMENT IS EXECUTED AS OF SEPTEMBER 17, 2018.**

**BORROWER:**

**TATUNG COMPANY OF AMERICA, INC.**

By: _____
　　Huei-Jihh Jih, President of Tatung Company of
　　America, Inc.

**LENDER:**

**EAST WEST BANK**

x _____
　　Authorized Signer

# DISBURSEMENT REQUEST AND AUTHORIZATION

| **Borrower:** | Tatung Company of America, Inc.<br>2850 East El Presidio Street<br>Carson, CA 90810 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |
|---|---|---|---|

**LOAN TYPE.** This is a Variable Rate Nondisclosable Revolving Line of Credit Loan to a Corporation for $12,000,000.00 due on September 7, 2019.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☐ Personal, Family, or Household Purposes or Personal Investment.

☒ Business (Including Real Estate Investment).

**SPECIFIC PURPOSE.** The specific purpose of this loan is: The purpose of this modification is to renew and decrease principal amount, and amend financial covenants.

**FLOOD INSURANCE.** As reflected on Flood Map No. 06037C1955F dated 09-26-2008, for the community of City of Carson, some of the property that will secure the loan is not located in an area that has been identified by the Administrator of the Federal Emergency Management Agency as an area having special flood hazards. Therefore, although flood insurance may be available for the property, no special flood hazard insurance protecting property not located in an area having special flood hazards is required by law for this loan at this time.

**DISBURSEMENT INSTRUCTIONS.** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $12,000,000.00 as follows:

| | | |
|---|---|---|
| Other Disbursements:<br>$12,000,000.00 Modification | $12,000,000.00 | |
| Note Principal: | $12,000,000.00 | |

**CHARGES PAID IN CASH.** Borrower has paid or will pay in cash as agreed the following charges:

| | | |
|---|---|---|
| Prepaid Finance Charges Paid in Cash:<br>$250.00 Processing Fees | $250.00 | |
| Other Charges Paid in Cash:<br>$800.00 Documentation Fees<br>$2,250.00 Appraisal Fee<br>$850.00 Appraisal Review Fee<br>$3,823.58 Collateral audit Examination Fee | $7,723.58 | |
| Total Charges Paid in Cash: | $7,973.58 | |

**AUTOMATIC PAYMENTS.** Borrower hereby authorizes Lender automatically to deduct from Borrower's Demand Deposit - Checking account, numbered 8063012986, the amount of any loan payment. If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment. At any time and for any reason, Borrower or Lender may voluntarily terminate Automatic Payments.

**LOAN FEE DEDUCTION.** Borrower authorizes Lender to deduct the fees and any other third party costs and expenses related to the Loan and charges above from Borrower's checking account number 8063012986 with Lender, all without further consent of Borrower. Lender is fully entitled to take such actions even if Borrower gives contrary instructions or demands to Lender.

**REQUEST FOR ADVANCE.** All requests for Advances and line pay downs received in Lender's Loan Service Dept. at 9300 Flair Drive, 6th Floor, El Monte, CA 91731 after 4:00 p.m. will be treated as having been requested on the next succeeding business day.

Any (__) of the following individuals are authorized to request advances and authorize payments under this loan, and take all additional actions such individual(s) may deem necessary or appropriate to implement the provisions of the documents relating to this loan. The individuals named below hold the titles appearing after their respective names, and true specimens of their signatures appear after their respective names below.

| | |
|---|---|
| HUEI-JIHN JIH, President | _signature_ |
| Name/Title | Signature |
| LINDA LI, Accounting Manager | _Linda Li_ |
| Name/Title | Signature |
| _____ | _____ |
| Name/Title | Signature |
| _____ | _____ |
| Name/Title | Signature |

**FINANCIAL CONDITION. BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED SEPTEMBER 17, 2018.**

# DISBURSEMENT REQUEST AND AUTHORIZATION
## (Continued)

**Loan No: 3803238**                                                                 **Page 2**

**BORROWER:**

**TATUNG COMPANY OF AMERICA, INC.**

By: _____

Huel-Jinn  Jih,  President  of  Tatung  Company  of
America, Inc.

LaserPro, Ver. 18.2.0.027  Copr. Finastra USA Corporation 1997, 2018.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFI\LPL\I20.FC  TR-26627  PR-7

# DISCLOSURE OF RIGHT TO RECEIVE A COPY OF AN APPRAISAL

| Applicant: | Tatung Company of America, Inc. | Lender: | East West Bank |
|---|---|---|---|
| 2850 | 1850 El Presidio Street | | Loan Servicing Department |
| H.J.Jih | Long Beach, CA  90810 | | 9300 Flair Drive, 6th Floor |
| | | | El Monte, CA  91731 |

## Disclosure of Right to Receive a Copy of an Appraisal

**Application Number:  3803238**                                       **Loan Number:  3803238**

You have the right to a copy of the appraisal report used in connection with your application for credit.  If you wish to have a copy, please write to us at the following mailing address East West Bank Appraisal Department 228 West Garvey Avenue Monterey Park, CA  91754.  We must hear from you no later than ninety (90) days after we notify you about the action taken on your credit application or no later than ninety (90) days after you withdraw your application.

In your letter, give us the following information:

Borrower's name, property address and loan number

Upon your request, the appraisal report will be sent to:

        1850 El Presidio Street
        Long Beach, CA  90810

**Costs of Providing the Appraisal Copy:**  You are required to pay the cost of the appraisal.

### APPLICANT ACKNOWLEDGMENT

I acknowledge that I have received a copy of this **Disclosure of Right to Receive a Copy of an Appraisal**.

APPLICANT:

TATUNG COMPANY OF AMERICA, INC.

By: _____  9/9/19
        Huei-Jihh Jih, President of Tatung Company        Date
        of America, Inc.

LaserPro, Ver. 19.2.0.042  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - CA  E:\PRO\CLOAN\DOCIC\FILPL@14.FC  TR-29627  PR-7

# CHANGE IN TERMS AGREEMENT

| Borrower: | Tatung Company of America, Inc.<br>~~1850~~ El Presidio Street<br>Long Beach, CA  90810 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

*2850*
*H.J.Jih*

**Principal Amount:  $11,000,000.00**                 **Date of Agreement:  September 4, 2019**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**  The Promissory Note dated **June 7, 2017** for Loan Number 3803238 in the original Principal Amount of $15,000,000.00, along with any and all subsequent Change in Terms Agreements (collectively referred to as "Note").

**DESCRIPTION OF CHANGE IN TERMS.**

The **maturity date** of the Note is hereby extended from September 7, 2019 **to September 7, 2020**.

The **Principal Amount** of the Note is hereby decreased **to Eleven Million and 00/100 Dollars (11,000,000.00).**

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

**TATUNG COMPANY OF AMERICA, INC.**

By: _____
Huei-Jihh  Jih,  President  of  Tatung  Company  of
America, Inc.

LaserPro, Ver. 19.2.0.042  Copr. Finastra USA Corporation 1997. 2019.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFILPL\D20C.FC  TR-26627  PR-7

# FOURTH MODIFICATION TO THE LOAN AGREEMENT

| Borrower: | Tatung Company of America, Inc.<br>~~1050~~ El Presidio Street<br>Long Beach, CA  90810 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

*2850*
*H.J.Jih*

This **FOURTH MODIFICATION TO THE LOAN AGREEMENT** is attached to and by this reference is made a part of the Business Loan Agreement (Loan #3803238) dated June 7, 2017, including all modifications thereto, and executed in connection with a loan or other financial accommodations between Lender and Borrower.

The section entitled "**LINE USAGE**" is hereby amended and restated as follows:

**LINE USAGE.** The usage of the Loan shall be governed by the following sub-limits.   Any amounts outstanding under any of the following sub-limits which are not due earlier than the maturity date stated in the Note shall be due and payable on the maturity date stated in the Note notwithstanding any later or extended date, payment date, due date, or expiration date stated in any other agreement with Lender:

The Maximum aggregate amount that may be outstanding under all sub-limits (items 1 through 6): $11,000,000.00.

The Maximum aggregate amount that may be outstanding under sub-limits (items 3 through 6): $11,000,000.00.

1.   Up to $5,000,000.00 for issuance of Sight Letters of Credit.   A "Sight Letter of Credit" means a Letter of Credit (a formal letter that authorizes a third party "beneficiary" to draw drafts on the Lender, under conditions stated in the letter which often require presentation of required documents in order, under applicable law, hereinafter referred to as "Letter of Credit") issued by Lender for Borrower that are payable upon draft by the beneficiary, provided the terms of the Letter of Credit are met.

2.   Up to $5,000,000.00 for issuance of Usance Letters of Credit.   A "Usance Letter of Credit" means a Letter of Credit that is payable on a specific date after draft by the beneficiary, provided the terms of the Letter of Credit are met.

3.   Up to $2,000,000.00 for Banker's Acceptances.   A "Banker's Acceptance" is a promised future payment, or time draft, which is accepted by Lender, often in connection with a Usance Letter of Credit.

4.   Up to $5,000,000.00 for advances of up to 90 days for Trust Receipt Financing.   "Trust Receipt Financing" means an Advance to pay for release of goods to Borrower based upon title in favor of Lender to the released goods.

5.   Up to $5,000,000.00 for advances of up to 90 days for Trust Receipt Financing of Banker's Acceptances due and payable under Letters of Credit issued and accepted by Lender with the term of the Advance reduced by the tenor of the usance draft.   The words "Trust Receipt Financing of Banker's Acceptances" means an advance to pay on the maturity of an accepted time draft.

6.   Up to $11,000,000.00 for Clean Advances of up to 365 days. "Clean Advance" means all Advances for a business purpose.

The definitions of trade terms in the Line Usage Sub-Limit Paragraphs 1 through 6, above, are for reference only, and are not intended to be inclusive. The actual usage may vary based on the structure of the trade finance transaction for which the instrument is issued.

**THIS FOURTH MODIFICATION TO THE LOAN AGREEMENT IS EXECUTED AS OF SEPTEMBER 4, 2019.**

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
   Huei-Jih Jih, President of Tatung Company of
   America, Inc.

LENDER:

EAST WEST BANK

X _____
   Authorized Signer

LaserPro, Ver. 18.2.0.042  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFI\LPL\G60.FC  TR-26627  PR-7

## NOTICE OF FINAL AGREEMENT

| Borrower: | Tatung Company of America, Inc. | Lender: | East West Bank |
|---|---|---|---|
| | 1850 El Presidio Street | | Loan Servicing Department |
| | Long Beach, CA  90810 | | 9300 Flair Drive, 6th Floor |
| | | | El Monte, CA  91731 |

*2880*
*H. J. Jih*

BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES,  (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (C) THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

As used in this Notice, the following terms have the following meanings:

**Loan.**  The term "Loan" means the following described loan:  **Loan No. 3803238.**

**Loan Agreement.**  The term "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, relating to the Loan, together with any subsequent written modification documents for this Loan evidenced by all Notice of Final Agreements executed in regards to the Loan, and including without limitation the following:

### LOAN DOCUMENTS

- Fourth Modification to the Loan Agreement
- Disclosure of Right to Receive a Copy of An Appraisal
- Change In Terms Agreement
- Agreement to Provide Insurance
- Disbursement Request and Authorization
- Notice of Final Agreement

**Parties.**  The term "Parties" means East West Bank and any and all entities or individuals who are obligated to repay the loan or have pledged property as security for the Loan, including without limitation the undersigned.

Each Party who signs below, other than East West Bank, acknowledges, represents, and warrants to East West Bank that it has received, read and understood this Notice of Final Agreement.  This Notice is dated as of September 4, 2019.

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn  Jih,  President  of  Tatung  Company  of America, Inc.

GRANTOR:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn  Jih,  President  of  Tatung  Company  of America, Inc.

LENDER:

EAST WEST BANK

X _____
Authorized Signer

LaserPro, Ver. 19.2.0.042  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CIFILPL\G60.FC  TR-26627  PR-7

## AGREEMENT TO PROVIDE INSURANCE

| | | | |
|---|---|---|---|
| **Grantor:** | Tatung Company of America, Inc. | **Lender:** | East West Bank |
| ~~2850~~ | ~~1850~~ El Presidio Street | | Loan Servicing Department |
| H.J.T.h | Long Beach, CA  90810 | | 9300 Flair Drive, 6th Floor |
| | | | El Monte, CA  91731 |

**INSURANCE REQUIREMENTS.**  Grantor, Tatung Company of America, Inc. ("Grantor"), understands that insurance coverage is required in connection with the extending of a loan or the providing of other financial accommodations to Grantor by Lender.  These requirements are set forth in the security documents for the loan.  The following minimum insurance coverages must be provided on the following described collateral (the "Collateral"):

**Collateral:**  **All Inventory and Equipment.**
   **Type:**  All risks, including fire, theft and liability.
   **Amount:**  Full Insurable Value.
   **Basis:**  Replacement value.
   **Endorsements:**  Lender loss payable clause with stipulation that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender.
   **Comments:**  Lender's Loss Payable Endorsement to read:  East West Bank, its successors and/or assigns, at P.O. Box 60021, City of Industry, CA 91716-0021.

   Inventory Insurance (Business personal property insurance included) shall not be less than $6,000,000.00.

   Loan No. as indicated on your Note to be listed on the Policy.
   **Latest Delivery Date:**  By the loan closing date.

**Collateral:**  **2850 East El Presidio Street, (Long Beach Area), Carson, CA  90810.**
   **Type:**  Fire and extended coverage.
   **Amount:**  Full Insurable Value; however in no event greater than the value of the replacement cost of the improvements.
   **Basis:**  Replacement value.
   **Endorsements:**  Standard mortgagee's clause with stipulation that coverage will not be cancelled or diminished without a minimum of 30 days prior written notice to Lender, and without disclaimer of the insurer's liability for failure to give such notice.
   **Comments:**  Lender's Loss Payable Endorsement to read:  East West Bank, its successors and/or assigns, at P.O. Box 60021, City of Industry, CA 91716-0021.

   **DEDUCTIBLE.**  Not to exceed $50,000.00.

   Loan No. as indicated on your Note to be listed on the Policy.
   **Latest Delivery Date:**  By the loan closing date.

**INSURANCE COMPANY.**  Grantor may obtain insurance from any insurance company Grantor may choose that is reasonably acceptable to Lender.  Grantor understands that credit may not be denied solely because insurance was not purchased through Lender.

**FLOOD INSURANCE.**  Flood Insurance for the Collateral securing this loan is described as follows:

   **Real Estate at 2850 East El Presidio Street, (Long Beach Area), Carson, CA  90810.**
   The Collateral securing this loan is not currently located in an area identified as having special flood hazards.  Therefore, no special flood hazard insurance is necessary at this time.  Should the Collateral at any time be deemed to be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain flood insurance, if available, within 45 days after notice is given by Lender that the Collateral is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.  Flood insurance may be purchased under the National Flood Insurance Program, from private insurers providing "private flood insurance" as defined by applicable federal flood insurance statutes and regulations, or from another flood insurance provider that is both acceptable to Lender in its sole discretion and permitted by applicable federal flood insurance statutes and regulations.

**INSURANCE MAILING ADDRESS.**  All documents and other materials relating to insurance for this loan should be mailed, delivered or directed to the following address:

   East West Bank
   Loan Service Department - Insurance
   P.O. Box 60021
   City of Industry, CA  91716-0021

**FAILURE TO PROVIDE INSURANCE.**  Grantor agrees to deliver to Lender, on the latest delivery date stated above, proof of the required insurance as provided above, with an effective date of September 4, 2019, or earlier.  Grantor acknowledges and agrees that if Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may do so at Grantor's expense as provided in the applicable security document.  The cost of any such insurance, at the option of Lender, shall be added to the indebtedness as provided in the security document.  GRANTOR ACKNOWLEDGES THAT IF LENDER SO PURCHASES ANY SUCH INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE DEBT, EXCLUDING ANY UNEARNED FINANCE CHARGES, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, GRANTOR'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED.  IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

**AUTHORIZATION.**  For purposes of insurance coverage on the Collateral, Grantor authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Collateral, the loan or other financial accommodations, or both.

## AGREEMENT TO PROVIDE INSURANCE
### (Continued)

Loan No: 3803238                                                                 Page 2

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT TO PROVIDE INSURANCE AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 4, 2019.

GRANTOR:

TATUNG COMPANY OF AMERICA, INC.

By: _____
Huei-Jihn Jih, President of Tatung Company of America, Inc.

---

**FOR LENDER USE ONLY**
**INSURANCE VERIFICATION**

DATE: _____          PHONE _____
_____

AGENT'S NAME: _____
AGENCY: _____
ADDRESS: _____
INSURANCE COMPANY: _____
POLICY NUMBER: _____
EFFECTIVE DATES: _____

COMMENTS: _____

---

**FOR LENDER USE ONLY**
**INSURANCE VERIFICATION**

DATE: _____          PHONE _____
_____

AGENT'S NAME: _____
AGENCY: _____
ADDRESS: _____
INSURANCE COMPANY: _____
POLICY NUMBER: _____
EFFECTIVE DATES: _____

COMMENTS: _____

## DISBURSEMENT REQUEST AND AUTHORIZATION

| Borrower: | Tatung Company of America, Inc. | Lender: | East West Bank |
|---|---|---|---|
| | 1850 El Presidio Street | | Loan Servicing Department |
| | Long Beach, CA 90810 | | 9300 Flair Drive, 6th Floor |
| | | | El Monte, CA 91731 |

2850
H.J.Jih

**LOAN TYPE.** This is a Variable Rate Nondisclosable Revolving Line of Credit Loan to a Corporation for $11,000,000.00 due on September 7, 2020. This is a secured renewal loan.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☐ **Personal, Family, or Household Purposes or Personal Investment.**

☒ **Business (Including Real Estate Investment).**

**SPECIFIC PURPOSE.** The specific purpose of this loan is: The specific purpose of this modification is to decrease commitment amount and extend the maturity date.

**FLOOD INSURANCE.** As reflected on Flood Map No. 06037C1955F dated 09-26-2008, for the community of City of Carson, some of the property that will secure the loan is not located in an area that has been identified by the Administrator of the Federal Emergency Management Agency as an area having special flood hazards. Therefore, although flood insurance may be available for the property, no special flood hazard insurance protecting property not located in an area having special flood hazards is required by law for this loan at this time.

**DISBURSEMENT INSTRUCTIONS.** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $11,000,000.00 as follows:

| | | |
|---|---|---|
| **Other Disbursements:** | | $11,000,000.00 |
| $11,000,000.00 Renewal and Reduce Commitment Amount | | |
| | | |
| **Note Principal:** | | $11,000,000.00 |

**CHARGES PAID IN CASH.** Borrower has paid or will pay in cash as agreed the following charges:

| | | |
|---|---|---|
| **Prepaid Finance Charges Paid in Cash:** | | $250.00 |
| $250.00 Processing Fees | | |
| **Other Charges Paid in Cash:** | | $4,600.00 |
| $3,500.00 Collateral Exam | | |
| $800.00 Documentation Fees | | |
| $300.00 Appraisal Fee | | |
| | | |
| **Total Charges Paid in Cash:** | | $4,850.00 |

**AUTOMATIC PAYMENTS.** Borrower hereby authorizes Lender automatically to deduct from Borrower's Demand Deposit - Checking account, numbered 8063012986, the amount of any loan payment. If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment. At any time and for any reason, Borrower or Lender may voluntarily terminate Automatic Payments.

**PREPAID INTEREST/LOAN FEE DEDUCTION.** Borrower authorizes Lender to deduct the prepaid interest, fees, charges, and any other costs and expenses related to the Loan and charges above from Borrower's checking account number _____ with Lender, all without further consent of Borrower. Lender is fully entitled to take such actions even if Borrower gives contrary instructions or demands to Lender.

**REQUEST FOR ADVANCE.** All requests for Advances and line pay downs received in Lender's Loan Service Dept. at 9300 Flair Drive, 6th Floor, El Monte, CA 91731 after 4:00 p.m. will be treated as having been requested on the next succeeding business day.

Any (2) of the following individuals are authorized to request advances and authorize payments under this loan, and take all additional actions such individual(s) may deem necessary or appropriate to implement the provisions of the documents relating to this loan. The individuals named below hold the titles appearing after their respective names, and true specimens of their signatures appear after their respective names below.

| HUEI-JIHN JIH  President /CEO | | |
|---|---|---|
| Name/Title | Signature | |
| LINDA LI  Accounting Manager | | |
| Name/Title | Signature | |
| | | |
| Name/Title | Signature | |
| | | |
| Name/Title | Signature | |

**FINANCIAL CONDITION.** BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED SEPTEMBER 4, 2019.

## DISBURSEMENT REQUEST AND AUTHORIZATION
### (Continued)

Loan No: 3803238                                                                                    Page 2

---

BORROWER:

TATUNG COMPANY OF AMERICA, INC.

By: _____
   Huei-Jihn Jih, President of Tatung Company of
   America, Inc.

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT "3"**

[Weekly Payroll List – October 4, 2019]

| Co.# | File # | Employee Name | Dept. | Department | Hire Date | Union | Hourly Rate | Wages per Pay Period | WK#40 Estimated Pay | | | |
|------|--------|---------------|-------|------------|-----------|-------|-------------|---------------------|----------|-----------|-------|---|
| | | | | | | | | | Gross Pay | Incentive | Total | |
| 12P | 012821 | Meao, Julie | 018070 | Plant A Commer | 08/08/2011 | N | $ 15.72 | $ 628.96 | $ 628.96 | $ - | $ 628.96 | |
| 12P | 012829 | Rodriguez, Widyawati | 018070 | Plant A Commer | 03/05/2012 | N | $ 17.71 | $ 708.52 | $ 700.00 | $ - | $ 700.00 | |
| 12P | 012631 | Butsanoy, Chev | 018090 | Plant A Commer | 03/20/2006 | N | $ 18.42 | $ 736.92 | $ 718.50 | $ - | $ 718.50 | |
| 12P | 012636 | Chau, Alan | 018090 | Plant A Commer | 05/22/2006 | N | $ 17.43 | $ 697.20 | $ 697.20 | $ - | $ 697.20 | |
| 12P | 010486 | Hernandez, Yessica | 018090 | Plant A Commer | 06/15/1998 | U | $ 13.30 | $ 531.80 | $ 531.80 | $ - | $ 531.80 | |
| 12P | 010955 | Rodriguez-Tamayo, Jose Luis | 018090 | Plant A Commer | 04/26/1990 | U | $ 14.95 | $ 597.80 | $ 597.80 | $ - | $ 597.80 | |
| 12P | 011083 | Tain, Henry | 018090 | Plant A Commer | 07/24/1981 | U | $ 17.46 | $ 698.20 | $ 900.00 | $ - | $ 900.00 | |
| 12P | 12250 | Ying, Le Rong | 018090 | Plant A Commer | 09/17/2019 | N | $ 17.06 | $ 682.36 | $ 682.36 | $ - | $ 682.36 | new |
| 12P | 010140 | Cabudol, Celedonio M. | 019070 | Plant A General | 03/09/1998 | N | $ 18.40 | $ 735.96 | $ 735.96 | $ - | $ 735.96 | |
| 12P | 010942 | Rodriguez-Tamayo, Francisco J. | 019075 | Plant A Traffic | 09/04/1990 | N | $ 14.55 | $ 581.80 | $ 630.89 | $ - | $ 630.89 | |
| 12P | 012398 | Vo, Eddie Q. | 019075 | Plant A Traffic | 09/16/2003 | N | $ 16.52 | $ 660.76 | $ 644.24 | $ - | $ 644.24 | |
| 12P | 010442 | Gutierrez, Eduardo | 031598 | Plant B Game Vi | 02/10/1992 | U | $ 15.25 | $ 610.00 | $ 800.00 | $ - | $ 800.00 | |
| 12P | 010437 | Muniz-Gonzalez, J. Guadalupe | 031598 | Plant B Game Vi | 06/15/1993 | U | $ 19.80 | $ 792.00 | $ 850.00 | $ - | $ 850.00 | |
| 12P | 010853 | Pena, Maria C. | 031598 | Plant B Game Vi | 09/18/1995 | N | $ 23.56 | $ 942.48 | $ 942.48 | $ - | $ 942.48 | |
| 12P | 012606 | Samala, Jasper John P. | 031598 | Plant B Game Vi | 08/01/2005 | N | $ 17.53 | $ 701.20 | $ 701.20 | $ - | $ 701.20 | |
| 12P | 010296 | Dominguez, Maximiano | 038058 | Plant B Hub | 01/19/1988 | U | $ 15.71 | $ 628.20 | $ 700.00 | $ - | $ 700.00 | |
| 12P | 012841 | Lizarraga, Ma Teresa | 038058 | Plant B Hub | 07/09/1998 | U | $ 12.80 | $ 511.80 | $ 450.00 | $ - | $ 450.00 | |
| | | | | | | | | $ 11,445.96 | $ 11,911.39 | $ - | $ 11,911.39 | |

**WK40 pay date 10/04/19**
**for pay period 9/22~09/28/19**

| | EE | | ER contribution |
|---|---|---|---|
| Direct Deposit & Checks | $ 9,153.38 | | |
| Payroll tax withholding | $ 1,715.00 | $ | 945.73 |
| 401K withholding | $ 724.78 | $ | 188.10 |
| Insurance withholding | $ 119.25 | | |
| 401K Loan | $ 106.68 | | |
| Union Fees | $ - | | |
| Garnishment | $ 92.30 | | |
| **Total Wages** | **$ 11,911.39** | **$** | **1,133.83** |

# EXHIBIT "4"

[Weekly Payroll List – October 11, 2019]

| Co.# | File # | Employee Name | Dept. | Department | Hire Date | Union | Hourly Rate | Wages per Pay Period | WK#41 Estimated Pay Gross Pay | Incentive | Total |
|------|--------|---------------|-------|------------|-----------|-------|-------------|---------------------|---------|-----------|-------|
| 12P | 012821 | Meao, Julie | 018070 | Plant A Commerc | 08/08/2011 | N | $ 15.72 | $ 628.96 | $ 628.96 | $ - | $ 628.96 |
| 12P | 012829 | Rodriguez, Widyawati | 018070 | Plant A Commerc | 03/05/2012 | N | $ 17.71 | $ 708.52 | $ 700.00 | $ - | $ 700.00 |
| 12P | 012631 | Butsanoy, Chev | 018090 | Plant A Commerc | 03/20/2006 | N | $ 18.42 | $ 736.92 | $ 718.50 | $ - | $ 718.50 |
| 12P | 012636 | Chau, Alan | 018090 | Plant A Commerc | 05/22/2006 | N | $ 17.43 | $ 697.20 | $ 697.20 | $ - | $ 697.20 |
| 12P | 010486 | Hernandez, Yessica | 018090 | Plant A Commerc | 06/15/1998 | U | $ 13.30 | $ 531.80 | $ 531.80 | $ - | $ 531.80 |
| 12P | 010955 | Rodriguez-Tamayo, Jose Luis | 018090 | Plant A Commerc | 04/26/1990 | U | $ 14.95 | $ 597.80 | $ 597.80 | $ - | $ 597.80 |
| 12P | 011083 | Tain, Henry | 018090 | Plant A Commerc | 07/24/1981 | U | $ 17.46 | $ 698.20 | $ 900.00 | $ - | $ 900.00 |
| 12P | 12250 | Ying, Le Rong | 018090 | Plant A Commerc | 09/17/2019 | N | $ 17.06 | $ 682.36 | $ 682.36 | $ - | $ 682.36 |
| 12P | 010140 | Cabudol, Celedonio M. | 019070 | Plant A General | 03/09/1998 | N | $ 18.40 | $ 735.96 | $ 735.96 | $ - | $ 735.96 |
| 12P | 010942 | Rodriguez-Tamayo, Francisco J. | 019075 | Plant A Traffic | 09/04/1990 | U | $ 14.55 | $ 581.80 | $ 630.89 | $ - | $ 630.89 |
| 12P | 012398 | Vo, Eddie Q. | 019075 | Plant A Traffic | 09/16/2003 | N | $ 16.52 | $ 660.76 | $ 644.24 | $ - | $ 644.24 |
| 12P | 010442 | Gutierrez, Eduardo | 031598 | Plant B Game Vi | 02/10/1992 | U | $ 15.25 | $ 610.00 | $ 800.00 | $ - | $ 800.00 |
| 12P | 010437 | Muniz-Gonzalez, J. Guadalupe | 031598 | Plant B Game Vi | 06/15/1993 | U | $ 19.80 | $ 792.00 | $ 850.00 | $ - | $ 850.00 |
| 12P | 010853 | Pena, Maria C. | 031598 | Plant B Game Vi | 09/18/1995 | N | $ 23.56 | $ 942.48 | $ 942.48 | $ - | $ 942.48 |
| 12P | 012606 | Samala, Jasper John P. | 031598 | Plant B Game Vi | 08/01/2005 | N | $ 17.53 | $ 701.20 | $ 701.20 | $ - | $ 701.20 |
| 12P | 010296 | Dominguez, Maximiano | 038058 | Plant B Hub | 01/19/1988 | U | $ 15.71 | $ 628.20 | $ 700.00 | $ - | $ 700.00 |
| 12P | 012841 | Lizarraga, Ma Teresa | 038058 | Plant B Hub | 07/09/1998 | U | $ 12.80 | $ 511.80 | $ 450.00 | $ - | $ 450.00 |
| | | | | | | | | $ 11,445.96 | $ 11,911.39 | $ - | $ 11,911.39 |

WK41 pay date 10/11/19
for pay period 9/29~10/05/19

| | EE | ER contribution |
|---|-----|-----|
| Direct Deposit & Checks | $ 8,782.72 | |
| Payroll tax withholding | $ 1,615.94 | $ 945.73 |
| 401K withholding | $ 724.78 | $ 188.10 |
| Insurance withholding | $ 588.97 | |
| 401K Loan | $ 106.68 | |
| Union Fees | $ - | |
| Garnishment | $ 92.30 | |
| **Total Wages** | **$ 11,911.39** | **$ 1,133.83** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "5"

[Bi-Weekly Payroll List – October 4, 2019]

| Co.# | File # | Employee Name | Dept. | Department | Hire Date | Union | Hourly Rate | Wages per Pay Period | WK#40 Estimated Pay Gross Pay | Incentive | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| B&S | 012872 | Hsu, Amy | 018070 | Plant A Commercial | 01/08/2018 | N | $ 25.20 | $ 2,016.00 | $ 2,016.00 | $ - | $ 2,016.00 |
| B&S | 011616 | Iozzi, John | 018070 | Plant A Commercial | 01/25/1999 | N | $ 30.28 | $ 2,422.56 | $ 2,422.56 | $ - | $ 2,422.56 |
| B&S | 012744 | Lee, Mike Pin Far | 018070 | Plant A Commercial | 05/14/1984 | N | $ 60.00 | $ 4,800.00 | $ 4,800.00 | $ - | $ 4,800.00 |
| B&S | 011639 | Liau, Tom | 018070 | Plant A Commercial | 12/27/1993 | N | $ 24.20 | $ 1,936.16 | $ 1,936.16 | $ - | $ 1,936.16 |
| B&S | 012875 | Lin, Elton | 018070 | Plant A Commercial | 12/01/2018 | N | $ 29.42 | $ 2,353.84 | $ 2,353.84 | $ - | $ 2,353.84 |
| B&S | 011728 | Tsou, Robin L P. | 018070 | Plant A Commercial | 09/26/1983 | N | $ 42.40 | $ 3,392.00 | $ 3,392.00 | $ - | $ 3,392.00 |
| B&S | 011769 | Yu, Michael T. | 018070 | Plant A Commercial | 01/09/1995 | N | $ 17.97 | $ 1,437.28 | $ 1,437.28 | $ - | $ 1,437.28 |
| B&S | 011555 | Chen, Long-Kwong | 018090 | Plant A Commercial Se | 09/12/1990 | N | $ 27.23 | $ 2,178.16 | $ 2,178.16 | $ - | $ 2,178.16 |
| B&S | 011739 | Wee, Florencio Li | 018090 | Plant A Commercial Se | 07/03/1986 | N | $ 77.20 | $ 6,176.00 | $ 6,176.00 | $ - | $ 6,176.00 |
| B&S | 012775 | Fan, Liang Tsan | 019020 | Plant A Commercial R& | 10/06/2008 | N | $ 21.87 | $ 1,749.68 | $ 1,749.68 | $ - | $ 1,749.68 |
| B&S | 011580 | Farzin, Parvize A. | 019020 | Plant A Commercial R& | 01/19/1996 | N | $ 46.01 | $ 3,681.12 | $ 3,681.12 | $ - | $ 3,681.12 |
| B&S | 012100 | Thai, Trung K. | 019020 | Plant A Commercial R& | 09/18/2000 | N | $ 29.51 | $ 2,360.64 | $ 2,360.64 | $ - | $ 2,360.64 |
| B&S | 012628 | Tsai, Ping-Huang | 019020 | Plant A Commercial R& | 03/01/2006 | N | $ 29.51 | $ 2,360.64 | $ 2,360.64 | $ - | $ 2,360.64 |
| B&S | 011615 | Hwang, Benjamin | 019070 | Plant A General Affairs | 03/25/1998 | N | $ 14.15 | $ 1,131.92 | $ 1,131.92 | $ - | $ 1,131.92 |
| B&S | 012676 | Chen, Ling-Ling | 019071 | Plant A Accounting | 08/21/2006 | N | $ 26.84 | $ 2,147.36 | $ 2,147.36 | $ - | $ 2,147.36 |
| B&S | 011637 | Li, Linda Yueh-Hsia | 019071 | Plant A Accounting | 06/10/1985 | N | $ 70.41 | $ 5,632.80 | $ 5,632.80 | $ - | $ 5,632.80 |
| B&S | 011659 | Lin, Yupin J. | 019071 | Plant A Accounting | 07/01/1999 | N | $ 28.78 | $ 2,302.64 | $ 2,302.64 | $ - | $ 2,302.64 |
| B&S | 011700 | Shen, Kaun-Huei | 019071 | Plant A Accounting | 01/25/1988 | N | $ 41.58 | $ 3,326.72 | $ 3,326.72 | $ - | $ 3,326.72 |
| B&S | 011575 | Villa, Grace M. | 019071 | Plant A Accounting | 12/17/1987 | N | $ 29.64 | $ 2,371.04 | $ 2,371.04 | $ - | $ 2,371.04 |
| B&S | 012694 | Liang, Yin-Chien | 019072 | Plant A Administration | 11/01/2006 | N | $ 23.18 | $ 1,854.24 | $ 1,854.24 | $ - | $ 1,854.24 |
| B&S | 011594 | Ho, Vivien | 019074 | Plant A Information Tec | 08/19/1996 | N | $ 38.07 | $ 3,045.20 | $ 3,045.20 | $ - | $ 3,045.20 |
| B&S | 011643 | Lin, Chien Feng | 019074 | Plant A Information Tec | 06/24/1998 | N | $ 45.09 | $ 3,607.52 | $ 3,607.52 | $ - | $ 3,607.52 |
| B&S | 011734 | Wang, Dau-Ping | 019074 | Plant A Information Tec | 07/14/1997 | N | $ 45.10 | $ 3,608.00 | $ 3,608.00 | $ - | $ 3,608.00 |
| B&S | 012591 | Wu, Wendy Weini | 019074 | Plant A Information Tec | 05/31/2005 | N | $ 34.82 | $ 2,785.92 | $ 2,785.92 | $ - | $ 2,785.92 |
| B&S | 012134 | Chang, Chih Chang | 019075 | Plant A Traffic | 11/09/2000 | N | $ 20.62 | $ 1,649.20 | $ 1,700.00 | $ - | $ 1,700.00 |
| B&S | 012473 | Liu, Jiann-Ying | 019075 | Plant A Traffic | 12/07/1998 | N | $ 29.18 | $ 2,334.48 | $ 2,334.48 | $ - | $ 2,334.48 |
| B&S | 011707 | Velazquez, Fabiola H. | 019075 | Plant A Traffic | 09/08/1992 | N | $ 18.38 | $ 1,470.24 | $ 1,600.00 | $ - | $ 1,600.00 |
| B&S | 011749 | Wu, Ming-Sheun | 019075 | Plant A Traffic | 03/01/1986 | N | $ 15.11 | $ 1,209.04 | $ 1,209.04 | $ - | $ 1,209.04 |
| B&S | 012838 | Majano, Vilma | 019077 | Plant A Human Resour | 06/10/2013 | N | $ 27.50 | $ 2,200.00 | $ 2,200.00 | $ - | $ 2,200.00 |
| B&S | 012707 | Huang, Feng-Ying | 031598 | Plant B Game Video Pl | 01/08/2007 | N | $ 28.23 | $ 2,258.32 | $ 2,258.32 | $ - | $ 2,258.32 |
| B&S | 010206 | Chang, Luxtar | 038058 | Plant B Hub | 09/01/1998 | N | $ 23.00 | $ 1,840.00 | $ 1,840.00 | $ - | $ 1,840.00 |
| B&S | 012688 | Frasco, David Deryk | 038058 | Plant B Hub | 10/03/2006 | N | $ 38.98 | $ 3,118.64 | $ 3,118.64 | $ - | $ 3,118.64 |
| B&S | 011794 | Lee, Peter Kaw Hway | 038058 | Plant B Hub | 12/28/1999 | N | $ 24.00 | $ 1,920.00 | $ 1,920.00 | $ - | $ 1,920.00 |
| B&S | 011776 | Lin, Lian Jeng | 066000 | Georgia Plant Import & | 09/07/1987 | N | $ 24.00 | $ 1,920.00 | $ 1,920.00 | $ - | $ 1,920.00 |
| B&S | 012857 | Wu, Yan | 066000 | Georgia Plant Import & | 07/21/2014 | N | $ 18.31 | $ 1,464.96 | $ 1,464.96 | $ - | $ 1,464.96 |

$ 90,062.32 | $ 90,242.88 | $ - | $ 90,242.88

sales commission is paid once a month

WK40 pay date 10/04/19
for pay period 09/15~09/28/19

|  | EE | ER contribution |
|---|---|---|
| Direct Deposit & Checks | $ 58,504.44 | |
| Payroll tax withholding | $ 16,214.00 | $ 5,685.25 |
| 401K withholding | $ 10,116.00 | $ 1,781.31 |
| Insurance withholding | $ 4,207.60 | |
| 401K Loan | $ 1,200.84 | |
| Total Wages | $ 90,242.88 | $ 7,466.56 |

# **<u>EXHIBIT "6"</u>**

[Bi-Weekly Payroll List – October 18, 2019]

| Co.# | File # | Employee Name | Dept. | Department | Hire Date | Union | Hourly Rate | Wages per Pay Period | WK#42 Estimated Pay Gross Pay | Incentive | Total |
|------|--------|---------------|-------|------------|-----------|-------|-------------|----------------------|-------------------------------|-----------|-------|
| B&S | 012872 | Hsu, Amy | 018070 | Plant A Commercial | 01/08/2018 | N | $ 25.20 | $ 2,016.00 | $ 2,016.00 | $ - | $ 2,016.00 |
| B&S | 011616 | Iozzi, John | 018070 | Plant A Commercial | 01/25/1999 | N | $ 30.28 | $ 2,422.56 | $ 2,422.56 | $ - | $ 2,422.56 |
| B&S | 012744 | Lee, Mike Pin Far | 018070 | Plant A Commercial | 05/14/1984 | N | $ 60.00 | $ 4,800.00 | $ 4,800.00 | $ - | $ 4,800.00 |
| B&S | 011639 | Liau, Tom | 018070 | Plant A Commercial | 12/27/1993 | N | $ 24.20 | $ 1,936.16 | $ 1,936.16 | $ - | $ 1,936.16 |
| B&S | 012875 | Lin, Elton | 018070 | Plant A Commercial | 12/01/2018 | N | $ 29.42 | $ 2,353.84 | $ 2,353.84 | $ - | $ 2,353.84 |
| B&S | 011728 | Tsou, Robin L P. | 018070 | Plant A Commercial | 09/26/1983 | N | $ 42.40 | $ 3,392.00 | $ 3,392.00 | $ - | $ 3,392.00 |
| B&S | 011769 | Yu, Michael T. | 018070 | Plant A Commercial | 01/09/1995 | N | $ 17.97 | $ 1,437.28 | $ 1,437.28 | $ - | $ 1,437.28 |
| B&S | 011555 | Chen, Long-Kwong | 018090 | Plant A Commercial Ser | 09/12/1990 | N | $ 27.23 | $ 2,178.16 | $ 2,178.16 | $ - | $ 2,178.16 |
| B&S | 011739 | Wee, Florencio Li | 018090 | Plant A Commercial Ser | 07/03/1986 | N | $ 77.20 | $ 6,176.00 | $ 6,176.00 | $ - | $ 6,176.00 |
| B&S | 012775 | Fan, Liang Tsan | 019020 | Plant A Commercial R& | 10/06/2008 | N | $ 21.87 | $ 1,749.68 | $ 1,749.68 | $ - | $ 1,749.68 |
| B&S | 011580 | Farzin, Parvize A. | 019020 | Plant A Commercial R& | 01/19/1996 | N | $ 46.01 | $ 3,681.12 | $ 3,681.12 | $ - | $ 3,681.12 |
| B&S | 012100 | Thai, Trung K. | 019020 | Plant A Commercial R& | 09/18/2006 | N | $ 29.51 | $ 2,360.64 | $ 2,360.64 | $ - | $ 2,360.64 |
| B&S | 012628 | Tsai, Ping-Huang | 019020 | Plant A Commercial R& | 03/01/2006 | N | $ 29.51 | $ 2,360.64 | $ 2,360.64 | $ - | $ 2,360.64 |
| B&S | 011615 | Hwang, Benjamin | 019070 | Plant A General Affairs | 03/25/1998 | N | $ 14.15 | $ 1,131.92 | $ 1,131.92 | $ - | $ 1,131.92 |
| B&S | 012676 | Chen, Ling-Ling | 019071 | Plant A Accounting | 08/21/2006 | N | $ 26.84 | $ 2,147.36 | $ 2,147.36 | $ - | $ 2,147.36 |
| B&S | 011637 | Li, Linda Yueh-Hsia | 019071 | Plant A Accounting | 06/10/1985 | N | $ 70.41 | $ 5,632.80 | $ 5,632.80 | $ - | $ 5,632.80 |
| B&S | 011659 | Lin, Yupin J. | 019071 | Plant A Accounting | 07/01/1999 | N | $ 28.78 | $ 2,302.64 | $ 2,302.64 | $ - | $ 2,302.64 |
| B&S | 011700 | Shen, Kaun-Huei | 019071 | Plant A Accounting | 01/25/1988 | N | $ 41.58 | $ 3,326.72 | $ 3,326.72 | $ - | $ 3,326.72 |
| B&S | 011575 | Villa, Grace M. | 019071 | Plant A Accounting | 12/17/1987 | N | $ 29.64 | $ 2,371.04 | $ 2,371.04 | $ - | $ 2,371.04 |
| B&S | 012694 | Liang, Yin-Chien | 019072 | Plant A Administration | 11/01/2006 | N | $ 23.18 | $ 1,854.24 | $ 1,854.24 | $ - | $ 1,854.24 |
| B&S | 011594 | Ho, Vivien | 019074 | Plant A Information Tech | 08/19/1996 | N | $ 38.07 | $ 3,045.20 | $ 3,045.20 | $ - | $ 3,045.20 |
| B&S | 011643 | Lin, Chien Feng | 019074 | Plant A Information Tech | 06/24/1998 | N | $ 45.09 | $ 3,607.52 | $ 3,607.52 | $ - | $ 3,607.52 |
| B&S | 011734 | Wang, Dau-Ping | 019074 | Plant A Information Tech | 11/14/1994 | N | $ 45.10 | $ 3,608.00 | $ 3,608.00 | $ - | $ 3,608.00 |
| B&S | 012591 | Wu, Wendy Weini | 019074 | Plant A Information Tech | 05/31/2005 | N | $ 34.82 | $ 2,785.92 | $ 2,785.92 | $ - | $ 2,785.92 |
| B&S | 012134 | Chang, Chih Chang | 019075 | Plant A Traffic | 11/09/2000 | N | $ 20.62 | $ 1,649.20 | $ 1,700.00 | $ - | $ 1,700.00 |
| B&S | 012473 | Liu, Jiann-Ying | 019075 | Plant A Traffic | 12/07/1998 | N | $ 29.18 | $ 2,334.48 | $ 2,334.48 | $ - | $ 2,334.48 |
| B&S | 011707 | Velazquez, Fabiola H. | 019075 | Plant A Traffic | 09/08/1992 | N | $ 18.38 | $ 1,470.24 | $ 1,600.00 | $ - | $ 1,600.00 |
| B&S | 011749 | Wu, Ming-Sheun | 019075 | Plant A Traffic | 03/01/2006 | N | $ 15.11 | $ 1,209.04 | $ 1,209.04 | $ - | $ 1,209.04 |
| B&S | 012838 | Majano, Vilma | 019077 | Plant A Human Resource | 06/10/2013 | N | $ 27.50 | $ 2,200.00 | $ 2,200.00 | $ - | $ 2,200.00 |
| B&S | 012707 | Huang, Feng-Ying | 031598 | Plant B Game Video Pla | 01/08/2007 | N | $ 28.23 | $ 2,258.32 | $ 2,258.32 | $ - | $ 2,258.32 |
| B&S | 010206 | Chang, Luxtar | 038058 | Plant B Hub | 09/01/1998 | N | $ 23.00 | $ 1,840.00 | $ 1,840.00 | $ - | $ 1,840.00 |
| B&S | 012688 | Frasco, David Deryk | 038058 | Plant B Hub | 10/03/2006 | N | $ 38.98 | $ 3,118.64 | $ 3,118.64 | $ - | $ 3,118.64 |
| B&S | 011794 | Lee, Peter Kaw Hway | 038058 | Plant B Hub | 12/28/1999 | N | $ 24.00 | $ 1,920.00 | $ 1,920.00 | $ - | $ 1,920.00 |
| B&S | 011776 | Lin, Lian Jeng | 066000 | Georgia Plant Import & | 09/07/1987 | N | $ 24.00 | $ 1,920.00 | $ 1,920.00 | $ - | $ 1,920.00 |
| B&S | 012857 | Wu, Yan | 066000 | Georgia Plant Import & | 07/21/2014 | N | $ 18.31 | $ 1,464.96 | $ 1,464.96 | $ - | $ 1,464.96 |
| | | | | | | | | $ 90,062.32 | $ 90,242.88 | $ - | $ 90,242.88 |

WK42 pay date 10/18/19
for pay period 09/29~10/12/19

| | EE | ER contribution |
|---|------|-----------------|
| Direct Deposit & | $ 58,504.44 | |
| Payroll tax withh | $ 16,214.00 | $ 5,685.25 |
| 401K withholdir | $ 10,116.00 | $ 1,781.31 |
| Insurance withh | $ 4,207.60 | |
| 401K Loan | $ 1,200.84 | |
| Total Wages | $ 90,242.88 | $ 7,466.56 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>EXHIBIT "7"</u>

[Commissions List]

| Co.# | File # | Employee Name | Dept. | Department | Hire Date | Union | Hourly Rate | Wages per Pay Period | WK#42 Estimated Pay | | |
|------|--------|---------------|-------|------------|-----------|-------|-------------|----------------------|---------------------|---|---|
| | | | | | | | | | Gross Pay | Incentive | Total |
| 12P | 012821 | Meao, Julie | 018070 | Plant A Commerc | 08/08/2011 | N | $ 15.72 | $ 628.96 | $ - | $ 300.00 | $ 300.00 |
| | | | | | | | | $ 628.96 | $ - | $ 300.00 | $ 300.00 |

| | EE | | ER contribution |
|---|---|---|---|
| Direct Deposit & Checks | $ 241.00 | | |
| Payroll tax withholding | $ 35.00 | $ | 24.00 |
| 401K withholding | $ 24.00 | $ | 7.20 |
| Insurance withholding | $ - | | |
| 401K Loan | $ - | | |
| Union Fees | $ - | | |
| Garnishment | $ - | | |
| **Total Wage** | **$ 300.00** | **$** | **31.20** |

| Co.# | File # | Employee Name | Dept. | Department | Hire Date | Union | Hourly Rate | Wages per Pay Period | WK#42 Estimated Pay | | |
|------|--------|---------------|-------|------------|-----------|-------|-------------|----------------------|---------------------|---|---|
| | | | | | | | | | Gross Pay | Incentive | Total |
| B&S | 011616 | Iozzi, John | 018070 | Plant A Commercial | 01/25/1999 | N | $ 30.28 | $ 2,422.56 | $ - | $ 700.00 | $ 700.00 |
| B&S | 011639 | Liau, Tom | 018070 | Plant A Commercial | 12/27/1993 | N | $ 24.20 | $ 1,936.16 | $ - | $ 1,300.00 | $ 1,300.00 |
| B&S | 011769 | Yu, Michael T. | 018070 | Plant A Commercial | 01/09/1995 | N | $ 17.97 | $ 1,437.28 | $ - | $ 3,400.00 | $ 3,400.00 |
| | | | | | | | | $ 5,796.00 | $ - | $ 5,400.00 | $ 5,400.00 |
| | | | | | | | | | sales commission is paid once a month | | |

| | EE | | ER contribution |
|---|---|---|---|
| Direct Deposit & Checks | $ 4,061.00 | | |
| Payroll tax withholding | $ 972.00 | $ | 340.00 |
| 401K withholding | $ 367.00 | $ | 88.80 |
| Insurance withholding | $ - | | |
| 401K Loan | $ - | | |
| Total Wages | **$ 5,400.00** | **$** | **428.80** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "8"

[Proposed Utility Deposits]

Utilities

| TUS Address Number | Account # | Services | Utility Company | Address 1 | City | State | Zip | June 2019 Bill | July 2019 Bill | August 2019 Bill | Average/Proposed Deposit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10003951 | 2023396542 | Electricity | SOUTHERN CALIFORNIA EDISON CO. | P.O. BOX 300 | ROSEMEAD | CA | 91772-0001 | $ 2,997.18 | $ 3,620.54 | $ 3,218.06 | $ 3,278.59 |
| 31231080 | 1498422222 and 6995422222 | Water | CALIFORNIA WATER SERVICE COMPANY | P. O. BOX 51967 | LOS ANGELES | CA | 90051-6267 | $ 270.94 | $ 437.14 | $ 384.89 | $ 364.32 |
| 10012435 | 870130002 | Gas | SoCalGas-REMIT | P.O.BOX C | MONTEREY PARK | CA | 91756 | $ 21.71 | $ 23.92 | $ 19.83 | $ 21.82 |
| 31298321 | 1717945911 and 8310006635 | Telephone | AT&T | P. O. BOX 5019 | CAROL STREAM | IL | 60197-5019 | $ 3,338.33 | $ 3,355.57 | $ 3,392.47 | $ 3,362.12 |
| 10003281 | 3106314758,3106323588 and 3106329006 | Telephone | AT&T | P. O. BOX 5025 | CAROL STREAM | IL | 60197-5025 | $ 621.68 | $ 654.45 | $ 752.23 | $ 676.12 |
| 31235911 | 829475543X07032019 | Telephone | AT & T MOBILITY | P.O. BOX 6463 | CAROL STREAM | IL | 60197-6463 | $ 420.50 | $ 585.13 | $ 415.66 | $ 473.76 |
| 31163232 | 7709354535 | Telephone | AT&T | P.O. BOX 105262 | ATLANTA | GA | 30348-5262 | $ 260.17 | $ 336.79 | $ 346.73 | $ 314.56 |
| 31269571 | 893141078 and 341968385 | Telephone | T-MOBILE | P.O. BOX 790047 | ST. LOUIS | MO | 63179-0047 | $ 167.98 | $ 264.55 | $ 156.14 | $ 196.22 |
| 30000503 | US01-44541 | EDI (Internet) | GLOBAL EXCHANGE SERVICES | c/o JP Morgan Lock Box 29144 Network Place | Chicago | IL | 60673-1291 | $ 896.05 | $ 896.99 | $ 897.21 | $ 896.75 |
| | | | | | | | | | | | $ 9,584.28 |